UNITED STATES *v.* CAMPOS-SERRANO

No. 70–46. Argued October 14, 1971—Decided December 20, 1971

*William Bradford Reynolds* argued the cause for the United States *pro hac vice.* With him on the briefs were *Solicitor General Griswold, Assistant Attorney General Wilson, Beatrice Rosenberg,* and *Roger A. Pauley.*

*John J. Cleary,* by appointment of the Court, 401 U. S. 990, argued the cause and filed a brief for respondent.

*William J. Scott,* Attorney General, *Joel M. Flaum,* First Assistant Attorney General, and *James B. Zagel* and *Jayne A. Carr,* Assistant Attorneys General, filed a brief for the State of Illinois as *amicus curiae* urging reversal.

MR. JUSTICE STEWART delivered the opinion of the Court.

The respondent was convicted in a federal district court of possession of a counterfeit alien registration receipt card in violation of 18 U. S. C. § 1546,[1] and sentenced to a three-year prison term.[2]   The Court

---

[1] The applicable portion of § 1546 reads as follows:

"Whoever . . . knowingly forges, counterfeits, alters, or falsely makes any immigrant or nonimmigrant visa, permit, or other document required for entry into the United States, or utters, uses, attempts to use, possesses, obtains, accepts, or receives any such visa, permit, or document, knowing it to be forged, counterfeited, altered, or falsely made, or to have been procured by means of any false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained . . . .

.        .        .        .        .

"Shall be fined not more than $2,000 or imprisoned not more than five years, or both."

[2] The sentence was suspended, and the respondent was placed on probation for three years "on condition that he return to Mexico and not return to the United States illegally."   Pursuant to this sentence, he was remanded to the custody of the Immigration and Naturalization Service for deportation under a previous order. It appears that he is now in Mexico.   Clearly, the fact that the respondent is now out of the country does not render this case moot.   He is still under the sentence of the District Court and on probation subject to conditions imposed by the District Court. Should he violate those conditions, he will be subject to imprisonment under his continuing criminal sentence.

*Eisler* v. *United States*, 338 U. S. 189, is irrelevant to this case. There, the *petitioner* fled *voluntarily* from the United States and successfully resisted extradition.   We, therefore, declined to consider the merits of his case, just as we have declined over the years to consider the merits of criminal cases in which the party seeking review has escaped "from the restraints placed upon him pursuant to the conviction."   *Molinaro* v. *New Jersey*, 396 U. S. 365, 366; *Bonahan* v. *Nebraska*, 125 U. S. 692; *Smith* v. *United States*, 94 U. S. 97.   "While such an escape does not strip the case of its character as an adjudicable case or controversy, we believe it disentitles [the party] to call upon the resources of the

of Appeals reversed the conviction, 430 F. 2d 173, holding that because of the circumstances under which Government agents had acquired the card from the respondent, it had been unconstitutionally admitted against him at the trial under *Miranda* v. *Arizona,* 384 U. S. 436. We granted certiorari. 401 U. S. 936. We do not reach the constitutional issue, however, for we have concluded that the judgment of the Court of Appeals must be affirmed upon a discrete statutory ground. See *Ashwander* v. *Tennessee Valley Authority,* 297 U. S. 288, 347 (Brandeis, J., concurring).[3] We hold that possession of a counterfeit alien registration receipt card is not an act punishable under 18 U. S. C. § 1546.[4]

The statutory provision in question prohibits, *inter alia,* the counterfeiting or alteration of, or the possession, use, or receipt of an already counterfeited or altered "immigrant or nonimmigrant visa, permit, or other document required for entry into the United States." This offense originated in Section 22 (a) of the Immigration Act of 1924,[5] which covered only an "immigration visa or permit." The words "other document required for entry into the United States," were added in 1952 as part of the Immigration and Nationality Act. § 402 (a), 66 Stat. 275. The legislative history of the

---

Court for determination of his claims." *Molinaro* v. *New Jersey, supra,* at 366. In the present case, by contrast, the respondent has not fled from the restraints imposed by the District Court pursuant to this conviction. Rather, he is living under those restraints today.

[3] "The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of."

[4] Accord, *United States* v. *Fernandez-Gonzalez* (64 CR 101, ND Ill.) (unpublished opinion). Contrary to the suggestion in the dissenting opinion, our decision on this issue of statutory construction will hardly come as a "surprise" to the parties. The issue was presented to and decided by the Court of Appeals. It was argued and fully briefed before this Court by both parties.

[5] 43 Stat. 165.

1952 Act, however, does not make clear which "other" entry documents the Congress had in mind.[6]

Alien registration receipt cards were first issued in 1941. They are small, simple cards containing the alien's picture and basic identification information.[7] They have no function whatsoever in facilitating the initial entry into the United States. Rather, they are issued *after* an alien has entered the country and taken up residence. Their essential purpose is to effectuate the registration requirement for all resident aliens established in the Alien Registration Act of 1940.[8]

Until 1952, alien registration receipt cards could not even be used to facilitate *re-entry* into the United States by a resident alien who had left temporarily. Such an alien was required to obtain special documents authorizing his re-entry into the country, such as a visa or a re-entry permit.[9] However, in 1952—less than a month

---

[6] See H. R. Rep. No. 1365, 82d Cong., 2d Sess.; S. Rep. No. 1137, 82d Cong., 2d Sess.; H. R. Conf. Rep. No. 2096, 82d Cong., 2d Sess. The only one of these reports to make *any* mention whatsoever of the changes in § 1546 was H. R. Rep. No. 1365. It simply stated that "necessary amendments [are made] to other laws . . . . Most of those amendments are in the nature of conforming changes." *Id.*, at 88. It seems most likely that the purpose of the new language in § 1546 was to reach the specialized border-crossing identification cards, authorized as a substitute for a visa or a permit in the Alien Registration Act of 1940. See n. 9 and n. 12, *infra*. At the time H. R. Rep. No. 1365 was published, the alien registration receipt card had no "entry" or "re-entry" function.

[7] The Appendix filed by the Government in this case contains a reproduction of an alien registration receipt card, Form I–151 of the Immigration and Naturalization Service.

[8] See 54 Stat. 673. The statutory provisions for the registration of aliens are now contained in 8 U. S. C. §§ 1301–1306.

[9] Provision for the use of re-entry permits was made in the Immigration Act of 1924, § 10, 43 Stat. 158. The Alien Registration Act of 1940 required that an alien present one of three special documents—a visa, a re-entry permit, or a border-crossing identification card—in order to come into the United States. 54 Stat. 673.

before final enactment of the Immigration and Nationality Act—the Immigration and Naturalization Service promulgated a regulation that allowed resident aliens to use their registration receipt cards for re-entry purposes as a permissible substitute for the specialized documents.[10] The apparent reason for this regulation was to minimize paper work and streamline administrative procedures by giving resident aliens the option of using for re-entry a document already issued and serving other purposes. Thus, the registration receipt cards may now be used in lieu of a visa or a re-entry permit on condition that the holder is returning to the United States after a temporary absence of not more than one year.[11]

The Court of Appeals held that the limited, merely permissible, re-entry function of the alien registration receipt card is sufficient to make it a "document *required* for *entry* into the United States" under § 1546. 430 F. 2d, at 175. We cannot agree. It has long been settled that "penal statutes are to be construed strictly," *Federal Communications Comm'n* v. *American Broadcasting Co.,* 347 U. S. 284, 296, and that one "is not to be subjected to a penalty unless the words of the statute plainly impose it," *Keppel* v. *Tiffin Savings Bank,* 197 U. S. 356, 362. "[W]hen choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." *United States* v. *Universal C. I. T. Credit Corp.,* 344 U. S. 218, 221–222. In § 1546,

---

[10] The 1952 INS regulation provided that the alien registration receipt card could be used as a permissible substitute for a visa or a re-entry permit in effecting a re-entry into this country from a contiguous country. 17 Fed. Reg. 4921. In 1957, this permissible use of the alien registration receipt card was expanded to include re-entry from noncontiguous nations. 22 Fed. Reg. 6377. The present INS regulation appears in 8 CFR § 211.1 (b).

[11] 8 CFR § 211.1 (b).

Congress did speak in "clear and definite" language. But, taken literally and given its plain and ordinary meaning, that language does not impose a criminal penalty for possession of a counterfeited alien registration receipt card. Alien registration receipt cards *may* be used for *re-entry* by certain persons into the United States. They are not *required* for *entry*.

The canon of strict construction of criminal statutes, of course, "does not mean that every criminal statute must be given the narrowest possible meaning in complete disregard of the purpose of the legislature." *United States* v. *Bramblett,* 348 U. S. 503, 510. If an absolutely literal reading of a statutory provision is irreconcilably at war with the clear congressional purpose, a less literal construction must be considered. In this spirit, we read § 1546 in conjunction with 8 U. S. C. § 1101 (a)(13)—another part of the 1952 Immigration and Nationality Act—which provides that, under most circumstances, an "entry" into the United States is defined to include a "re-entry." We have held in the past that Congress did not intend these terms to be taken entirely synonymously. *Rosenberg* v. *Fleuti,* 374 U. S. 449. But Congress clearly did intend a significant overlap, and we cannot say that a document usable for "entry" into the United States under § 1546 does not include some documents usable for "re-entry." Nor do we hold that § 1546 applies only to those documents absolutely "required" in order to enter or re-enter the country. To do so would undermine the congressional purpose behind § 1546, since the Immigration and Naturalization Service has not required that presentation of any one particular document be the exclusive condition of crossing our borders.

While the apparent congressional purpose underlying § 1546 would thus seem to bar an uncompromisingly literal construction, the precise language of the provision

must not be deprived of all force. The principle of strict construction of criminal statutes demands that some determinate limits be established based upon the actual words of the statute. Accordingly, a "document required for entry into the United States" cannot be construed to include any document whatsoever that the Immigration and Naturalization Service, from time to time, decides may be presented for re-entry at the border. The language of § 1546 denotes a very special class of "entry" documents—documents whose primary *raison d'être* is the facilitation of entry into the country. The phrase, "required for entry into the United States," is descriptive of the nature of the documents; it is not simply an open-ended reference to future administrative regulations.

If, for example, the Immigration and Naturalization Service were to allow the presentation of identification such as a driver's license at the border, the nature of such a license would not suddenly change so that it would fall into the category of a "document required for entry into the United States" under § 1546. To be sure, if a counterfeit driver's license were presented to secure entry or re-entry into the country, the bearer could be prosecuted under 8 U. S. C. § 1325, which provides for the punishment of "[a]ny alien who . . . obtains entry to the United States by a willfully false or misleading representation . . . ." But mere possession of a counterfeit driver's license, far from the border, could not be prosecuted under § 1546. The reason is that a driver's license is not essentially an "entry" document. Rather, its primary purpose is to allow its bearer lawfully to drive a car, and the bearer's possession of a counterfeit license, far from the border, could not be assumed to be related to the policies underlying the 1952 Immigration and Nationality Act.

The same analysis applies to the alien registration receipt card. Its essential purpose is not to secure entry

into the United States, but to identify the bearer as a lawfully registered alien residing in the United States. It is issued to an alien *after* he has taken up residence in this country. It is intended to govern his activities and presence *within* this country. The card has been given a convenient, additional function as a permissible substitute for a visa or re-entry permit in facilitating re-entry into the United States by a resident alien. But, unlike a visa or a re-entry permit,[12] an alien registration receipt card serves this function in only a secondary way. Unlike a visa or a re-entry permit, it is not, by its nature, a "document required for entry into the United States" under § 1546.

This construction of the language of § 1546 is conclusively supported by that section's statutory context. In the 1952 Immigration and Nationality Act, Congress clearly regarded alien registration receipt cards as serving policies separate and distinct from those served by pure "entry" documents. Although, in 1952, those cards could be used as substitutes for visas or re-entry permits, the Congress chose to deal with them separately. In 8 U. S. C. § 1306 (c) and § 1306 (d), it specifically provided for the punishment of one "who procures or attempts to procure registration of himself or another person through fraud" and of one who counterfeits an alien registration receipt card. The fact that the Con-

---

[12] Visas and re-entry permits are the specialized "entry" documents for which the alien registration receipt card is a permissible substitute under present INS regulations. See n. 10, *supra.*

Border-crossing identification cards are like visas and re-entry permits, and unlike alien registration receipt cards, in that they are specialized documents whose sole purpose and function is to regulate the crossing of our national borders. Hence, the likelihood that Congress in 1952 wished to expand the coverage of § 1546 to reach border-crossing identification cards, see n. 6, *supra,* supports our holding. The expansion mandated by Congress was simply *within* the class of specialized "entry" documents.

gress did not rely on § 1546 to ensure the integrity of alien registration receipt cards indicates that it did not believe that they were covered by that section. Moreover, there is a very specific overlap between § 1546 and § 1306. Both sections explicitly prohibit counterfeiting, and both explicitly prohibit fraud in the acquisition of documents.[13]  Unless we assume that § 1306 is mere surplusage, we must conclude that § 1546 covers only specialized "entry" documents, and not alien registration receipt cards specifically covered in § 1306.[14]

For these reasons the judgment is

*Affirmed.*

MR. JUSTICE BLACKMUN, with whom THE CHIEF JUSTICE and MR. JUSTICE WHITE join, dissenting.

The Court today affirms the judgment of the Court of Appeals "upon a discrete statutory ground" and does

---

[13] The prohibition of counterfeiting in § 1546 is contained in the first paragraph of that section. See n. 1, *supra*. The prohibition of fraud in the acquisition of documents is contained in the third paragraph of § 1546, which reads as follows:

"Whoever, when applying for an immigrant or nonimmigrant visa, permit, or other document required for entry into the United States, or for admission to the United States personates another, or falsely appears in the name of a deceased individual, or evades or attempts to evade the immigration laws by appearing under an assumed or fictitious name without disclosing his true identity . . . .

.        .        .        .        .

"Shall be fined not more than $2,000 or imprisoned not more than five years, or both."

[14] " '[A] statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.' " *Market Co.* v. *Hoffman,* 101 U. S. 112, 115–116. See *Jarecki* v. *G. D. Searle & Co.,* 367 U. S. 303, 307–308. To be sure, the overlap between § 1546 and § 1306 is only partial, since § 1546 goes farther than § 1306—prohibiting the possession of counterfeit documents as well as the counterfeiting of documents. But the Congress would hardly have thought it necessary to create any overlap at all, if it had believed alien registration receipt cards were covered by § 1546.

not reach the questions with respect to which certiorari was granted.[1] This statutory ground was rejected by the District Court when it denied a defense motion to dismiss the indictment. It was also rejected by the Court of Appeals. 430 F. 2d 173, 175–176. I would reject it here.

The statutory issue to which the Court retreats is whether an alien registration card is a "document required for entry into the United States," within the meaning of 18 U. S. C. § 1546. The Court holds, somewhat to the surprise of the litigants I am sure, that the card is not such a document, and that Campos-Serrano's indictment, therefore, charged no offense under the statute. I feel that this conclusion has no support either in the statutory language and meaning or in the legislative history, and is certainly not supported by the practice, long in effect, at our Nation's borders.

I

The parent of § 1546 is § 22 (a) of the Immigration Act of 1924. 43 Stat. 165. That statute did not refer to "any immigrant or nonimmigrant visa, permit, or other document required for entry into the United States," as § 1546 does today. Instead, it spoke only of "any immigrant visa or permit." Nevertheless, even under the definition of "permit" in this older and narrower statute, Congress specifically included a temporary re-entry paper issued to and used by a resident alien who wished to

---

[1] "1. Whether the court below unduly extended *Miranda* v. *Arizona*, 384 U. S. 436, by holding, on the facts of this case, that agents of the Immigration and Naturalization Service were required to give respondent warnings before asking him to produce his alien registration card.

"2. Whether an alien registration card is a 'required record' which an alien must produce upon request irrespective of whether he is 'in custody.' " Pet. for Cert. 2.

leave the country for a period of less than one year.[2] Clearly, therefore, the statutory scheme, as far back as 1924, contemplated that knowing possession of an altered document useful only for *re-entering* the United States was punishable as a felony.

The registration card came into being with Title III of the Alien Registration Act of 1940, 54 Stat. 673. At first it served only for identification of the alien who had complied with the registration requirements. Section 30 of the 1940 Act, however, authorized the use of a separate "border-crossing identification card" by a resident alien in order to enable him to return to the United States after temporary travel to a contiguous country.

An INS regulation filed May 29, 1952, provided that a registration card, issued on or after September 10, 1946, "shall constitute a resident alien's border crossing card" and could be used by the alien in effecting re-entry into the United States provided he had not visited any foreign territory other than Canada or Mexico. 17 Fed. Reg. 4921–4922. This was the first time a registration card, as such, was recognized as a re-entry document. But it was so recognized. Five years later its use was expanded with respect to re-entry from nations that were not contiguous. 22 Fed. Reg. 6377 (1957). Its use for this purpose has continued to the present time. 8 CFR § 211.1 (b) (1971).

In addition to this administrative practice, the statutory language itself was expanded. Section 22 (a) of the 1924 Act was repealed in 1948 and simultaneously re-enacted without significant change as 18 U. S. C. § 1546 and as part of that year's general recodification of the federal criminal laws. 62 Stat. 771, 865. Finally, § 1546 was amended to its present form by § 402 (a) of the Immigration and Nationality Act of 1952. 66 Stat. 275.

---

[2] Sections 28 (k) and 10 of the 1924 Act, 43 Stat. 169 and 158.

There is no room for dispute that the 1952 change served to broaden, not to contract, the number of documents within the prohibition of § 1546. The 1924 reference to "any immigration visa or permit" is obviously but a lesser part of the later and still current phrase, "any immigrant or nonimmigrant visa, permit, or other document required for entry." See *United States* v. *Rodriguez*, 182 F. Supp. 479, 484 n. 3 (SD Cal. 1960), rev'd in part on other grounds, *sub nom. Rocha* v. *United States*, 288 F. 2d 545 (CA9), cert. denied, 366 U. S. 948 (1961). From 1924 until the 1952 legislation, narrower statutory language nevertheless had covered a document used solely for re-entry. Surely nothing in the expanded language of 1952 suggests congressional intent thenceforth to confine the statute to initial-entry documents. Indeed, congressional intent to the contrary, that is, to enlarge the coverage of § 1546, is evident not only from the statute's words but, as well, from the definition of "entry" in the 1952 Act, § 101 (a)(13), 66 Stat. 167, 8 U. S. C. § 1101 (a)(13):

> "The term 'entry' means *any coming of an alien* into the United States, from a foreign port or place or from an outlying possession, whether voluntary or otherwise, except . . . ." (Emphasis supplied.)

From this it inevitably follows that the phrase "document required for entry" embraces a document used for re-entry into the United States. One document of that kind is the alien registration card.[3]

This brief but clear administrative and legislative history, it seems to me, reveals and proves the intent of

---

[3] The face of the card, Form I–151, bears the recital, "This card will be honored in lieu of a visa and passport on condition that the rightful holder is returning to the United States after a temporary absence of not more than one year and is not subject to exclusion under any provision of the immigration laws."

Congress and the meaning and reach of the statute. The alien registration card, Form I–151, became one of a number of documents specified and accepted and *required* for re-entry.

The Court's opinion, as I read it, seems to accept most of all this, that is, that there is no § 1546 distinction between "entry" and "re-entry," and that an alien registration card is a document "required" for entry into the United States. *Ante,* at 298.

Having made this broad and, to me, sensible reading of § 1546, the Court, however, then reverses direction and conveniently restricts § 1546 to "a very special class of 'entry' documents—documents whose primary *raison d'être* is the facilitation of entry into the country," and it accuses the INS of standing to gain "an open-ended reference to future administrative regulations" if the Government were to prevail here. The reasons for this change of direction are not apparent to me. The Court's comparison of the registration card to a driver's license in this context is wide of the mark. A driver's license has nothing to do with immigration. A registration card has everything to do with immigration. It is authorized under the immigration statutes. It is required of a resident alien. 8 U. S. C. §§ 1301–1306. And for almost two decades it has been a re-entry document.

## II

The fact that there may be some overlapping between § 1546 and 8 U. S. C. § 1306 (d) does not prevent the application of § 1546 to the alien registration card.[4] Section 1306 (d) came into being as § 266 (d) of the 1952

---

[4] Overlapping in federal criminal statutes is not unknown. See, for example, *Sansone* v. *United States,* 380 U. S. 343 (1965); *Gore* v. *United States,* 357 U. S. 386 (1958); *Achilli* v. *United States,* 353 U. S. 373 (1957); *Prince* v. *United States,* 352 U. S. 322 (1957); *Spies* v. *United States,* 317 U. S. 492 (1943).

Act, 66 Stat. 226. It does refer specifically to "an alien registration receipt card," whereas § 1546 has no such specific reference. The two sections, however, have different purposes and relate to different aspects of immigration. Section 266 (d) was a part of the Act's chapter that concerned "Registration of Aliens." It has to do with the implementation and protection of the alien registration scheme. It reached counterfeiting alone. Section 1546, on the other hand, is concerned with entry into the country and with the integrity of documents used in effecting entry. It is not restricted to counterfeiting. It also reaches knowing possession and alteration.

The Court's exclusion of the alien registration card from the reach of § 1546 leaves entirely free from punishment the alteration of a card and the possession of a card with knowledge of its altered or counterfeit character. Surely Congress did not intend to leave that loophole.[5]

I therefore dissent from the Court's affirmance of the judgment of the Court of Appeals upon the "discrete statutory ground." I would decide that issue as the Court of Appeals decided it and I would go on to reach the questions we anticipated when we granted the petition for certiorari.

---

[5] The loophole is not closed by 8 U. S. C. § 1325, as the respondent would assert. Section 1325 concerns a very different offense, namely, the actual misuse of the entry document in obtaining entry to the United States. Section 1546, on the other hand, relates to potential misuse of the entry document after gaining entry to the country.