**The UNITED STATES of America**

v.

**Alphonso FIELDS, Jr., Defendant.**

No. CR–78–56.

United States District Court,
W. D. New York.

Oct. 25, 1978.

**316**

Richard J. Arcara, U. S. Atty., Buffalo, N. Y., for plaintiff; Kenneth A. Cohen, Asst. U. S. Atty., Buffalo, N. Y., of counsel.

Patrick J. Brown, Buffalo, N. Y., for defendant.

### FINDINGS OF FACT and CONCLUSIONS OF LAW

ELFVIN, District Judge.

Defendant herein was indicted April 19, 1978 for having about one month earlier attempted to bring one Nemiah Williams into the United States (Williams being an alien not lawfully entitled to enter this country), for having knowingly lied to the Immigration Service concerning Williams's citizenship and for having conspired with Williams to effect the latter's entry into the United States. Defendant is said to have made oral statements to a Customs Inspector at the "primary" inspection points, to an Immigration Inspector at the "secondary" inspection point and to a criminal investigator of the United States Immigration and Naturalization Service. Defendant moved to suppress evidence of such statements at trial and a hearing was had before me May 22, 1978. Defendant was not present at the hearing with the acquiescence of his attorney and, presumably, at defendant's choice. The testimony of the Immigration Inspector (Moore) and of the investigator (Sterling) was adduced. A preliminary hearing had been held March 23, 1978 and counsel agreed that the testimony of these witnesses would be the same as there given; however, the Assistant United States Attorney did elicit some direct testimony prior to cross-examination.

Williams and defendant had come to the Rainbow Bridge in Niagara Falls as passengers in an automobile driven by a third individual (Davis). At secondary inspection defendant stated that Williams was unable to speak, that Williams was defendant's father and that Williams had been born in Miami. Defendant's responses and explanations were deemed unsatisfactory by Moore who accused defendant of having taken Williams out of a Canadian hospital, Williams being attired in pajamas and wearing a hospital's sandals. Defendant then admitted that he had picked up Williams, his father, from a Canadian hospital as opposed to his earlier version that they were just driving around. When defendant was unable to name the hospital, defendant said that he would tell Moore the truth which was that his father, Williams, had got out of the hospital and that defendant has picked him up at a Toronto motel. De-

fendant exhibited a motel receipt. Moore told defendant that Williams was not defendant's father and that defendant was smuggling Williams into this country. Moore said he'd find out one way or the other and that, if defendant were smuggling Williams in, defendant would be subject to a $5,000 fine and five years in jail. Moore asked Davis what had occurred and Davis substantially corroborated defendant by stating that he had met defendant at a bar in Buffalo and had agreed to drive defendant to Toronto for $50 to pick up defendant's father. Thereupon defendant said he'd tell Moore the truth and exhibited an airplane ticket and said that he had come from New York City to bring Williams back from Toronto and was being paid $200 to do this. Moore still didn't believe defendant because defendant had been telling Moore that his name was Porter and the ticket was in the name of Fields. Defendant then admitted his name was Fields. Moore called in investigator Sterling, who took defendant to an office, handed him an advice-of-rights form which defendant appeared to read and which he said he understood and which he signed; Moore did not read or state the rights to defendant. Defendant told Sterling that defendant was returning from Toronto where he had picked up Williams at the request of one John Williams, a New York City friend of defendant. Defendant said that the Williams of Toronto was ill and unable to walk. Defendant had been paid $100 and given the airplane ticket and was to receive another $150 when he returned to New York City. Sterling then talked separately with Davis who told the same story as that given earlier to Moore. Sterling then talked separately again with defendant. About one hour had passed since the end of his first talk with defendant but Sterling did not re-advise defendant of his constitutional rights. Sterling said that defendant would not have been permitted to leave the area of his own volition and, whereas Moore had said that he was concerned whether Williams might be bringing a communicable disease into the United States (Moore admitting that he never had been doubtful of defendant's admissibility), Sterling admitted that he himself would not be involved with such a question or decision. Sterling denied ever having told defendant that he could gain leniency by cooperating and giving a statement. At the conclusion, Sterling asked defendant if he wanted to change his story.

At the conclusion of the hearing on this motion (at which hearing defendant voluntarily was not present and consequently did not testify), defendant's assigned counsel raised a legal argument not set forth in the motion papers—to wit, that Sterling was obligated to advise defendant again as to his *Miranda* rights when he resumed interrogating defendant after the approximately one-hour hiatus necessitated for the questioning of Davis. He cites no legal authority in support of such argument. Patently, the second closeting of defendant and Sterling was part and parcel of the same general session at the outset of which defendant adequately (on the basis of the evidence placed before me) was apprised of his attendant constitutional rights. Defendant was questioned, his companion Davis was queried and the questioning of defendant resumed (albeit in a different office because the occupant of the first-used office had reported for her work and with the time-to-time presence of one or two other Immigration agents or investigators). There was no need to re-acquaint defendant with his rights.

Defendant contends that his statements were not given voluntarily but that they were enticed from him by Moore's and Sterling's declamations of the harsh sentence that could be imposed upon him coupled with promised leniency should he "cooperate". Nothing in the record indicates any such promise.

The sole tenable position taken by defendant is that Moore accused defendant of lying to him and of attempting to smuggle Williams into the United States and advised defendant of the harsh punishment that awaited one who smuggled or attempted to smuggle and that Moore never advised defendant of his constitutional rights to re-

main silent and to be represented by an attorney. Moore contends that he only was concerned with the admissibility of Williams who could not or would not himself answer questions. Defendant assumed to answer all questions which related to Williams's status, which obviously was that of one who was in ill health and gave the appearance of having been plucked from a hospital. As soon as defendant told Moore that defendant was being compensated to bring Williams into this country, Moore desisted from further questioning of defendant and summoned criminal investigator Sterling. Sterling promptly and adequately advised defendant of his rights. Defendant cites *United States v. Campos-Serrano*, 430 F.2d 173 (7th Cir. 1970), *aff'd* (on other grounds) 404 U.S. 293, 92 S.Ct. 471, 30 L.Ed.2d 457 (1971). In that case Immigration agents who were conducting a search in Chicago for alien workers had arrested one individual and had gone with him to his apartment where Campos-Serrano was encountered. The latter admitted to Mexican nationality but exhibited an alien registration receipt card which was examined and returned to him. The agents departed from the apartment of Campos-Serrano but found outside the apartment a third individual who possessed an altered card. Such other individual shared the same apartment with Campos-Serrano and the arrested person and Campos-Serrano was again requested to show his card which, upon closer inspection, also was found to have been altered. His motion to suppress the card as evidence because he had not been advised of his constitutional rights was denied and he appealed from his subsequent conviction. The Court of Appeals reversed and remanded saying that, while Campos-Serrano was not in custody when requested to show the card the second time, the circumstances (mainly, that his apartment-mate had been arrested and was in the custody of the same agent who was asking again to see the card) was sufficient to invoke *Miranda.* Expressly, the court held that "the initial inquiry to determine whether the defendant [Campos-Serrano] was properly in this country did not violate his fifth amendment privilege" but that, "when the inquiry itself is directed at determining a criminal violation such as in this case where the agents are looking for forged 'cards' and the defendant's card had previously been examined, the privilege should apply." *Id.*, at 176. Putting aside the circumstance that the four justices of the United States Supreme Court who comprised the majority of the affirming court elected to proceed upon a "discrete statutory ground" rather than the constitutional question properly presented by the record (404 U.S., at 295, 92 S.Ct. 471) much to the disgruntlement of the three dissenting justices who preferred to reach the questions with respect to which certiorari had been granted,[1] the holding of the United States Court of Appeals for the Seventh Circuit seems not to be apropos of the instant situation. Campos-Serrano, for example, had exhibited in the first instance an apparently legitimate card as to which the agent had no question; defendant Fields never gave Moore a satisfactory response but went from one unconvincing version to another of the same. Also, what Moore finally got from Fields was merely a statement that he had come from New York City by plane and for $200 was to pick up Williams from a Toronto motel or hotel and bring him into the states and to New York City; in *Campos-Serrano* the court considered that defendant was compelled to "produce the crime itself", the same as saying "I did it." "[P]roduction of the forged card was sufficient *without more* to convict the defendant." (My emphasis.) 430 F.2d at 176–77. "[I]ntroduction of the forged card which was in [Campos-Serrano's] possession is *prima facie* evidence of [the] violation * * * and the only effective evidence [he] could produce in rebuttal would

---

1. One of which was "whether the court below unduly extended *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, by holding, on the facts of this case, that agents of the Immigration and Naturalization Service were required to give [Campos-Serrano] warnings before asking him to produce his alien registration card." 404 U.S. at 302, n. 1, 92 S.Ct. at 476.

be for him to testify", thus being forced to waive his Fifth Amendment privilege. *Id.,* at 177. What defendant Fields said to Moore falls far short of "the crime itself" and of "I did it" and was not sufficient "without more" to convict him.

 Significant, also, is the fact that the United States Court of Appeals for the Seventh Circuit differentiated *Campos-Serrano* from its own earlier decision in *United States v. Dickerson,* 413 F.2d 1111 (1969).[2] The latter presented, it was said in *Campos-Serrano,* non-custodial interrogation but interrogation which nevertheless required administration of the *Miranda* "rites". Therein, defendant had first been questioned by a revenue agent (whose concern was civil liability) but thereafter by both the revenue agent and a special agent (whose milieu was criminal investigations). Defendant did not know and was not advised of this distinction and neither agent advised him re silence and counsel. The court held (pp. 1116–17) "that *Miranda* warnings must be given to the taxpayer by either the revenue agent or the special agent at the inception of the first contact with the taxpayer after the case has been transferred to the Intelligence Division", the jurisdiction of which is limited to criminal investigations. This holding is pinpointed and spotlighted in a footnote to the above quotation as follows:

"[W]e have determined that the inception of the first contact with the taxpayer after referral to the Intelligence Division is the appropriate point at which to require the *Miranda*-type warnings * * *."

The dissenting opinion notes that the majority has distinguished "between the revenue agent before IRS has internally decided to consider prosecution and the revenue agent or special agent after such decision." *Id.,* at 1118. The same court in *Chavez-Raya v. Immigration & Naturalization Serv.,* 519 F.2d 397 (1975), defined the underlying rationale of *Dickerson* as "once the case has been transferred to the Intelligence Division it has sufficient criminal aspects to activate the *Miranda* warning requirement." *Id.,* at 402. In the next sen-

tence the court recognized that such approach has been rejected elsewhere. *See, United States v. White,* 417 F.2d 89, 91 (2d Cir. 1969), *cert. denied* 397 U.S. 912, 90 S.Ct. 910, 25 L.Ed.2d 92, *reh. denied* 397 U.S. 1030, 90 S.Ct. 1256, 25 L.Ed.2d 543 (1970), and *United States v. Dawson,* 486 F.2d 1326, 1329 (5th Cir. 1973). Defendant's supporting memorandum (unpaginated) claims that "[t]he setting at the time that the Defendant Williams [sic] was interrogated by the secondary inspector [Moore] is closely analogous to the situation were [sic] a taxpayer suspected of criminal activity in connection with the preparation and filing of Federal Income Tax Returns is questioned by Internal Revenue Service Agents" wherein "[t]he Courts have held that before a special agent may question a taxpayer relative to the preparation of [sic] filing of tax returns where a criminal activity is being investigated, the agents must give the taxpayer a so called *Miranda* warning." He cites as his single authority *Campos-Serrano,* which has, because of defendant's attempt to rely upon such alleged parallelism, been fully treated hereinabove and been shown to depend only upon *Dickerson,* now overruled as noted herein above. Even *Dickerson* safeguarded the statements in the instant case because Moore ceased his questioning immediately upon hearing that defendant was being paid to bring Williams in and because Moore thereupon called in the criminal investigator who at once apprised defendant of his *Miranda* rights.

 There properly was a detention of defendant by Moore with attendant questioning by Moore without defendant's having been apprised of his rights by Moore or anyone else. Immigration officers, such as Moore, are charged with a responsibility to examine all aliens who seek admission to the United States. 8 U.S.C. § 1225. It is reasonable and not far-fetched to hold that every person who presents himself or herself at a border point and seeks admission into the United States can be considered an alien until the opposite (namely, citizenship)

---

2. Overruled in *United States v. Fitzgerald,* 545 F.2d 578 (7th Cir. 1976).

has been determined and the person is detained. Such person is not free to leave, even by returning to whence he or she came, until the Immigration officer's reasonable interrogation has concluded. In such circumstances the person is not deprived of freedom of action in any significant way so as to bring into play the requirement for *Miranda*-type warnings. *United States v. Davis,* 259 F.Supp. 496, 498 (D.Mass.1966). Fields was not the individual whose admissibility was being determined but his then situation was the same as if he were; he was the spokesman for Williams whose right to enter and reside in the United States was being resolved. The Immigration and Naturalization Service does not have, however, carte blanche to elicit statements whatever the circumstances and there often will come a time and situation when the point of the Service's interrogation shifts to possible criminality. The United States District Court for the District of Massachusetts, in 1968 and without any mention of *United States v. Davis, supra,* decided that such point had been reached in a customs ambience (which closely parallels that of a border immigration investigation) when the individual had been taken to a personal search room and had partially disrobed, revealing plastic packages taped to his body. *United States v. Berard,* 281 F.Supp. 328. The court sustained the legality of the search of the person but suppressed as evidence the individual's statement, made in response to the officers' inquiry as to the packages' contents, that they contained heroin. While the court's rationale—namely, that the individual while in the search room would not have been permitted to leave had he tried and consequently had been deprived of his freedom of action in such a significant way as to amount to a custodial investigation within the meaning of *Miranda (id.,* at 335) —is not adopted by me, its conclusion is. At the point of the asking what the packages contained, a strong probability of criminality existed and to hold, as the *Berard* court did, that the constitutional warnings must be given before any further queries prima facie comports with fair play.

Such point was reached in the instant case when defendant told Moore that defendant had been or was being paid a sum of money to bring Williams into the United States.

Was such point reached earlier? In my opinion it was not. Admittedly, Moore may have been somewhat bullying and overreaching in his accusations that defendant was trying to smuggle Williams into this country and that defendant was lying in his responses. Perhaps suppression of the later-given confession ought to be granted defendant solely as a supervisory sanction to Immigration officials and as a warning not to engage in such in the future. I decline the invitation to exercise my discretion by imposing such a sanction. Only Moore and the Special Investigator Sterling testified at the suppression hearing. Moore said that he was concerned that Williams, who remained mute, might be bringing some communicable disease into the United States but did admit that he threatened defendant with a fine and imprisonment if defendant lied. (At the trial itself Moore testified that defendant stated that Williams was defendant's father who couldn't talk and who was a natural born citizen of the United States and that defendant's name was Porter. He said that Williams had suffered a stroke but couldn't explain what a stroke is. Moore told defendant that if he were engaged in smuggling the same would be discovered and advised defendant what the penalty would be. Defendant said he had procured Williams from a hospital but couldn't name the hospital. Defendant then said he had picked up Williams at a certain motel and then, when Moore accused defendant of bringing in Williams illegally, defendant admitted that he was being paid money to transport Williams and produced an airline ticket which showed defendant's true name.) Moore said that he summoned Sterling when he, Moore, became convinced that $200 was being paid to bring Williams into this country. Moore did not advise defendant of his rights but stopped his questioning and turned defendant over to Sterling, advising Sterling what defendant had stated con-

cerning the fee. Sterling properly and fully advised defendant of his *Miranda* rights before asking questions.

The evidence convinced me that defendant's constitutional rights had been adequately observed and that the oral statements made to Moore and to Sterling were properly admitted into evidence before the jury.