[No. B017274. Second Dist., Div. Four. Aug. 16, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
VLASTIMIL MILAN BRYCH, Defendant and Appellant.

**COUNSEL**

Hufstedler, Miller, Carlson & Beardsley, Hufstedler, Miller, Kaus & Beardsley, Warren L. Ettinger, Dan Marmalefsky, Robert Lawrence and Paul Presburger for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Robert F. Katz and Mark Alan Hart, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**GEORGE, J.**—This case confronts us with the question whether an appellate court should entertain an appeal from a criminal conviction where the defendant has severed all contact with his attorneys and voluntarily placed himself beyond the jurisdiction of the California courts. Under the unusual circumstances of the present case, we hold the appeal should be dismissed.

As the result of administering medical treatment to several individuals in 1980, appellant was convicted of conspiracy and numerous other offenses involving grand theft, practicing medicine without a license, and fraudulently providing cancer treatment.[1] He was sentenced to six years in prison, has completed that sentence, and is not under parole supervision. Appellant resides outside the United States, although his exact whereabouts are unknown to us, to his counsel, and to respondent.

Appellant's numerous assignments of error involve primarily (1) evidentiary rulings by the trial court. In addition, appellant contends (2) a jury instruction based on Health and Safety Code section 1707 constituted an unconstitutional mandatory presumption; (3) Business and Professions Code sections 2052 and 2053 are overbroad and vague; (4) Health and Safety Code section 1714 is a special statute and therefore appellant may not be charged under the general false pretenses statute; and (5) the prosecutor committed misconduct. (6) Appellant also asks this court to review the trial court's in camera inspection of the confidential psychiatric records of a witness.

Respondent's brief urges that because appellant resides in an undisclosed location outside the United States and refuses to communicate with his attorneys, we should dismiss the appeal for lack of jurisdiction over appellant. For the reasons that follow, we dismiss the appeal.

### FACTS

Because we do not reach the merits of the foregoing contentions made by appellant, we set forth only a relatively brief synopsis of the evidence received at his six-month trial, focusing by way of example on the evidence pertaining to one of the victims, Dr. Robert W. Metcalf.

Dr. Metcalf first heard of appellant in April 1980 from Dr. Richard O'Connor, a friend and fellow orthopedic surgeon suffering from oat cell

---

[1] Appellant was convicted of conspiracy (to violate Pen. Code, § 487, subd. 1; Bus. & Prof. Code, §§ 2052, 2053; and Health & Saf. Code, §§ 1706, 1714) in violation of Penal Code section 182, subdivisions (1), (4) and (5) (count 1); five counts of practicing medicine without a license under circumstances creating a risk of great bodily injury in violation of Business and Professions Code section 2053 (counts 2-6); attempted grand theft by false pretenses in violation of Penal Code sections 664, 532, and 487, subdivision 1 (count 7); two counts of grand theft by false pretenses in violation of Penal Code sections 532 and 487, subdivision 1 (counts 8-9); fraudulently providing a cancer treatment in violation of Health and Safety Code section 1714 (count 10); providing a cancer treatment without a license in violation of Health and Safety Code section 1706 (count 12); and practicing medicine without a license in violation of Business and Professions Code section 2052 (count 13). Count 11 of the information, alleging sale of an unauthorized cancer drug in violation of Health and Safety Code section 1707.1, was set aside by the court below prior to trial, pursuant to Penal Code section 995.

carcinoma, a highly malignant type of lung cancer. Dr. O'Connor said he was about to begin a new type of cancer treatment given by "Dr. Milan Brych" (appellant) in which a serum would be created from a sample of Dr. O'Connor's blood, which would stimulate his body's immune system to combat the cancer. In a telephone conversation a few days later, Dr. O'Connor told Dr. Metcalf he had received his first treatment and was feeling much better. When Dr. Metcalf saw Dr. O'Connor the next month, Dr. O'Connor's condition had improved visibly, and Dr. Metcalf decided to seek treatment from appellant for his rheumatoid arthritis.

Appellant told Dr. Metcalf the cancer serum was very expensive because it had to be made in either Australia or Europe, the required laboratory equipment being unavailable in the United States. Appellant said his telephone bill was $10,000 each month, because he needed constantly to speak to the laboratory technicians to ensure the serum was produced exactly to his specifications. Appellant stated additionally that six injections of the serum given one month apart, costing $10,000 per treatment, usually were sufficient to control cancer. According to appellant, the treatment for rheumatoid arthritis was similar but much easier; therefore, the serum could be produced locally.

Appellant said he had received his medical training in Czechoslovakia and had lived in Russia, Australia, New Zealand, and the Cook Islands before coming to the United States. Appellant claimed he had received an honorary degree from Cambridge University in 1979, and had treated Happy Rockefeller, Betty Ford and Jacqueline Bisset for cancer and Dr. Christiaan Barnard for rheumatoid arthritis.

On July 15, 1980, appellant, working in Dr. O'Connor's office, drew a sample of Dr. Metcalf's blood and said he would develop a serum using, among other facilities, a laboratory in his home. Dr. Metcalf had been taking cortisone, but appellant told him to stop. A few days later, appellant injected Dr. Metcalf with a milky substance, followed by a second injection one month later on August 18, 1980. Dr. Metcalf's condition improved after these treatments.

After several months of treatments, Dr. Metcalf became suspicious and telephoned Dr. Christiaan Barnard in South Africa. Dr. Metcalf then had laboratory tests conducted. The results convinced him the injections he had received from appellant consisted of high doses of cortisone.

Similar representations, treatment, and billing from appellant were received by David Collins, a South Carolina resident who had terminal cancer, and by other cancer patients: Robert Amick, Joseph Preston, and Iris

Silverman (the wife of Dr. Melvin Silverman, who was told by appellant that he had a medical degree and a Ph.D. from "a university in Slovakia").

As part of an investigation of appellant, Edward Perkins, an investigator for the Board of Medical Quality Assurance, consulted with a physician specializing in cancer treatment and learned the symptoms of oat cell carcinoma. Perkins was in reasonably good health and did not have cancer. On September 15, 1980, Perkins met with appellant and Dr. O'Connor at the latter's office. Perkins told appellant and Dr. O'Connor he had been diagnosed as having oat cell carcinoma and his doctor had recommended chemotherapy. On the following day Perkins again met with appellant and Dr. O'Connor. Appellant said his treatment would utilize a "specific antigen" for the tumor in Perkins' body which would create an antibody that would destroy the tumor. This serum would be made "in England and in Europe" and shipped on British Airways. Six monthly treatments would be required at a cost of $10,000 each. In six months Perkins' cancer would be gone. Dr. O'Connor took a blood sample from Perkins.

A few days later, appellant telephoned Perkins and told him the blood sample confirmed he had cancer and the serum would be shipped from England on British Airways that Monday. On Monday, September 22, 1980, Perkins returned to Dr. O'Connor's office. He was taken into a treatment room by a young woman and paid her $9,600 in cash. When appellant began preparations to give Perkins an injection, Perkins excused himself and gave a prearranged signal for additional officers to enter and arrest appellant. A briefcase recovered from the room in which appellant was about to administer the injection contained a number of vials of clear liquid which was analyzed and found to consist of alcohol and Cytoxin, a drug commonly used in chemotherapy and worth about $10 per vial.

Several cancer specialists, most notably Dr. Robert Good, testified that much research is proceeding on the treatment of cancer by immunotherapy using tumor-specific antigens, but in 1980 no such antigens had yet been identified and no such treatment was available. Dr. Good, who had never met appellant, described the claims attributed to appellant as "incredible." A reliable diagnosis of cancer cannot be based on a blood test; a sample of the tumor must be removed and examined.

Appellant's landlord testified there was no laboratory equipment in the house appellant was renting. A search of appellant's telephone records for the four-month period preceding his arrest revealed no monthly bills in an amount approximating $10,000. The records of British Airways for September 1-25, 1980, reflected no shipments either to or from appellant or Dr. O'Connor.

Joseph Preston, David Collins, and Dr. O'Connor each died of cancer between October 16 and November 29, 1980.[2]

## DISCUSSION

### DISMISSAL OF THE APPEAL

·On July 27, 1983, upon being sentenced to a term of six years in prison, appellant filed a notice of appeal. His requests for a stay of execution and bail on appeal were denied.

On July 16, 1985, appellant's attorneys filed in this court an application to be relieved as counsel, which sought an order "substituting either Appellant in pro per, or the State Public Defender." The declaration stated there had been "a complete breakdown in communication" evidenced by appellant's failure to respond to correspondence sent to him in prison by certified mail. Counsel visited appellant in prison three times, but appellant was

---

[2] In his defense, appellant offered the testimony of numerous witnesses who said appellant had cured them or a member of their family of either cancer or arthritis in New Zealand or the Cook Islands. In each instance the treatment consisted of monthly injections of an unidentified substance over a six-month period.

Appellant testified he received a degree in biochemistry in 1958 and a medical degree in 1964 in Czechoslovakia. He became licensed to practice medicine in New Zealand in 1969. He treated approximately 1200 cancer patients in New Zealand and 650 in the Cook Islands. Appellant explained that although his authority to practice medicine in New Zealand had been rescinded, one day later he was granted a hearing before the Supreme Court of New Zealand at which his license to practice medicine was restored effective immediately. (In an out-of-court statement, appellant claimed to have resolved his dispute with the New Zealand medical community by arguing his own case before the Queen of England and the Privy Council.) In 1979 he received an award from the International Biographical Center in Cambridge, England. Appellant testified at length concerning the manner in which cancer should be treated.

When he came to Los Angeles, appellant agreed to prepare a plan of treatment for Dr. O'Connor to be administered by O'Connor's regular physician. Dr. O'Connor was so impressed by his improvement he decided to change his medical practice from orthopedic surgery to oncology (the treatment of cancer) and asked appellant to join him as a research associate. It was Dr. O'Connor who set the fees. Because Dr. O'Connor expected to lose a great deal of income in abandoning his surgical practice, Dr. O'Connor needed to charge each patient $10,000 per month to generate sufficient funds to maintain his staff.

Appellant's testimony concerning the cancer treatment administered to his patients varied considerably from that given by those patients who testified for the prosecution. For example, appellant testified Dr. O'Connor refused to accept Amick as a patient and suggested he seek chemotherapy. Dr. O'Connor treated Collins and Preston, based on appellant's advice, using chemotherapy. Blood samples were taken in order to determine each patient's tolerance for the chemotherapy drugs. Appellant denied saying he had treated celebrities such as Happy Rockefeller and Dr. Christiaan Barnard. Appellant did not say he received a serum from England via British Airways. Instead, he received paperwork outlining individualized plans of treatment from Australia which were sometimes hand-carried by a friend of a friend, who was a pilot for British Airways.

"unwilling to assist" in the appeal. Additionally, appellant was without funds to pay his attorneys and was $30,000 in debt to the law firm. Appellant, significantly, refused to sign a claim prepared by his counsel which could have recovered, for payment to counsel, a substantial cash deposit owed to appellant by his bail bondsman. Counsel sent appellant copies of the request to be relieved but received no response from him.

By order dated August 26, 1985, we denied the application to relieve counsel. Relying on this division's decision in *Mandell* v. *Superior Court* (1977) 67 Cal.App.3d 1 [136 Cal.Rptr. 354], we held: "In view of the length of this record, the court would have great difficulty in obtaining alternate counsel, and an unacceptable delay in proceedings would be necessary to enable new counsel to become familiar with the case."

On April 15, 1987, appellant's counsel filed an application for extension of time, which included a declaration stating, in pertinent part: "In September 1986, Appellant Milan Brych completed his sentence and was released from incarceration. He left the United States and returned to New Zealand. In February 1987, I wrote Appellant in New Zealand at an address provided us, enclosing the draft statement of facts and statement of the case . . . . My partner Warren Ettinger and I together attempted to telephone him at a telephone number in New Zealand with which we had been provided. There was no answer to any of our telephone calls. In March 1987, the materials that I had sent to Appellant were returned as undeliverable. [¶] . . . When I received the materials back from New Zealand, I contacted a friend of Appellant's who resides in Southern California. That person, Dr. Milton Miller, informed us that Appellant did not wish us (his lawyers) to know his whereabouts or to communicate with him by telephone. He asked that we send the letter for Appellant to his office, and he would see that Dr. Brych received the package. Lacking any other alternative means of contacting Dr. Brych, we sent the package to Dr. Miller. [¶] . . . The package was received on March 16, 1987. Early this month, I contacted Dr. Miller who informed me that Dr. Brych was aware of the materials that we had sent. I again asked Dr. Miller to provide me with Dr. Brych's address or telephone number. He again reiterated that Dr. Brych does not wish us to speak with him or to know where he is located. Dr. Miller informed us on April 13, 1987 that we will be hearing from Dr. Brych in approximately two weeks. . . . [¶] . . . Should we not receive input from Dr. Brych, we would plan to file the brief nonetheless, in light of this Court's prior determination that we should represent him notwithstanding his lack of cooperation with counsel."[3]

---

[3] We note that appellant's counsel's only motion to be relieved was made and denied while appellant was still in custody. While counsel's continued representation of an absent and unpaying client is commendable, we observe that despite the change in circumstances which

In their respondent's brief filed March 8, 1988, the People for the first time requested dismissal of the appeal. In view of that request, we obtained further information from appellant's counsel concerning their degree of contact with appellant and his whereabouts. Appellant's counsel stated in a declaration filed July 6, 1988, that "Upon Dr. Brych's release from state custody, the Immigration and Naturalization Service sought to initiate deportation proceedings against Dr. Brych. . . . Dr. Brych left the country voluntarily and was not deported. [¶] . . . Since his release from custody, Dr. Brych has neither spoken with or written to my office." Appellant's counsel also said he did not know appellant's whereabouts and that a friend of appellant's said appellant wishes "as few people as possible know his location."

The unusual facts of this case appear to present an issue of first impression. The majority of decisions which have considered a motion to dismiss an appeal from a criminal conviction involve defendants who had become fugitives from justice. An appeal taken by a convicted defendant who escaped from custody was dismissed by the United States Supreme Court in *Smith* v. *United States* (1876) 94 U.S. 97 [24 L.Ed. 32] because the court concluded it would be unable to enforce its ruling: "If we affirm the judgment, he is not likely to appear to submit to his sentence. If we reverse it and order a new trial, he will appear or not, as he may consider most for his interest. Under such circumstances, we are not inclined to hear and decide what may prove to be only a moot case." (*Id.*, at p. 97 [24 L.Ed. at p. 32].) This reasoning was followed by the California Supreme Court in *People* v. *Redinger* (1880) 55 Cal. 290, where the court observed: "It would be a farce to proceed in a criminal cause, unless the Court had *control over the person charged,* so that its judgment might be made effective." (*Id.*, at p. 298, italics added; see also *People* v. *Buffalo* (1975) 49 Cal.App.3d 838, 839 [123 Cal.Rptr. 308].)

In the present case, appellant is not a fugitive. He has served his sentence and lawfully emigrated from the United States. The decisions discussing fugitives differ from the situation before us to the extent dismissal of those appeals was premised on the inability of the court to execute the sentence in the event the conviction were affirmed. But the dismissals in *Smith* and *Redinger* and their progeny were not based solely on the feasibility of executing the sentences before those courts. The appellate courts were concerned also with the circumstance that in the event the conviction were reversed and a new trial ordered, the defendant "will appear or not, as he may consider most for his interest." (*Smith* v. *United States, supra,* 94 U.S. 97.) That concern is equally applicable in the present case.

occurred when appellant was released and left the United States, appellant's attorneys did not renew their motion to be relieved as counsel.

Appellant deliberately has severed all involvement on his part in the present appeal. The compelling reasons for an appellate court not to proceed with an appeal under such circumstances were set forth by Justice Frankfurter in an opinion dissenting from an order removing from the docket an appeal by a defendant who had fled the United States. In urging that the appeal be dismissed, Justice Frankfurter focused on the dilemma "that the abstract questions brought before the Court by [the defendant] are no longer attached to any litigant." (*Eisler* v. *United States* (1949) 338 U.S. 189, 191 [93 L.Ed. 1897, 1899, 69 S.Ct. 1453].) Although the *Eisler* case involved a fugitive, Justice Frankfurter's opinion clearly reflects that the principles governing an appellate court's right to dismiss an appeal are not limited to such a context: "The circumstances which have called forth application of the principle have varied greatly, but all the instances of its application illustrate and confirm the basic limitation under which this Court functions, namely, that it can entertain a case and decide it *only if there is a litigant before it against whom the Court may enforce its decision.*" (*Id.*, at p. 192 [93 L.Ed. at p. 1900], italics added.)

 Although it is presumed that an attorney appearing before a court is authorized to represent his or her client (*Hayes* v. *Shattuck* (1862) 21 Cal. 51, 54), this presumption ceases when contrary information comes to the attention of the court. (*Broecker* v. *Moxley* (1934) 136 Cal.App. 248, 253 [28 P.2d 409].) The attorneys representing appellant have continued to perform their ethical duty to prosecute this appeal (*People* v. *Murphy* (1973) 35 Cal.App.3d 905, 921 [111 Cal.Rptr. 295]), but appellant is no longer in any real sense before this court. His refusal to divulge his location to his attorneys prevents them from communicating with him. By refusing in turn to communicate with them, appellant has stripped his attorneys of their authority to represent him. An attorney cannot prosecute an appeal on behalf of a client whose conduct and refusal to communicate evidence a total abandonment of his appeal.[4]

We express no opinion as to whether, standing alone, the establishment of residence outside the United States by an appellant who stands convicted in a criminal case constitutes justification for dismissal of an appeal. In *United States* v. *Campos-Serrano* (1971) 404 U.S. 293, 294-295, footnote 2 [30 L.Ed.2d 457, 460, 92 S.Ct. 471], an appeal from a criminal conviction was allowed to proceed where the defendant had complied with a condition of probation that he return to Mexico. In *People* v. *Cossey* (1950) 97

---

[4]Our discussion is limited to appeals initiated by the defendant. Obviously, a defendant cannot frustrate the prosecution's limited right to appeal simply by leaving the jurisdiction or refusing to communicate with defense counsel. (*United States* v. *Villamonte-Marquez* (1982) 462 U.S. 579, 581, fn. 2 [77 L.Ed.2d 22, 26, 103 S.Ct. 2573]; *People* v. *Bouchard* (1957) 49 Cal.2d 438 [317 P.2d 971].)

Cal.App.2d 101, 114-115 [217 P.2d 133], dismissal of the appeal was denied where the defendant resided in Canada but was on bail and thus remained in constructive custody.

Appellant voluntarily has left the United States and refuses to communicate with his attorneys or divulge to them his whereabouts. He deliberately has insulated himself from any communications from the California courts while availing himself of the appellate process through the efforts of his presently uncompensated attorneys. Appellant thus has placed himself in the enviable position of being able to decide unilaterally whether to return to the United States in the event this court reverses his conviction and the district attorney determines a retrial is feasible. We cannot reasonably assume that, if ordered to return to this jurisdiction for retrial, appellant would learn of such order and return voluntarily, or that he could be compelled to return. Such an approach on appellant's part to the present appeal is inherently offensive to the judicial process.

Under these circumstances, we decline to entertain appellant's appeal from his conviction.

## DISPOSITION

The appeal is dismissed.

Woods (A. M.), P. J., and Goertzen, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 27, 1988.