**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellant,*

            v.

MILENKO KRSTIC,
            *Defendant-Appellee.*

No. 08-30022

D.C. No.
CR-07-00047-BR

OPINION

Appeal from the United States District Court
for the District of Oregon
Anna J. Brown, District Judge, Presiding

Argued and Submitted
December 8, 2008—Portland, Oregon

Filed March 10, 2009

Before: Diarmuid F. O'Scannlain, Susan P. Graber, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge O'Scannlain

**COUNSEL**

David L. Atkinson, Assistant United States Attorney, Portland, Oregon, argued the cause for the plaintiff-appellant and filed the briefs. Karin J. Immergut, United States Attorney, District of Oregon, was on the briefs.

Christopher J. Schatz, Assistant Federal Public Defender, Portland, Oregon, argued the cause for the defendant-appellee and filed the brief.

## OPINION

O'SCANNLAIN, Circuit Judge:

We are confronted with a thorny question of statutory interpretation to discern whether an alien may be prosecuted for possession of an authentic immigration document obtained by means of a false statement.

I

A

Milenko Krstic, a Serbian national, worked as an engineer in the Bosnian city of Banovici until civil war broke out in 1992. After Bosnian authorities imposed curfews and employment restrictions in Banovici, Krstic and his family fled to several war-torn locations throughout Serbia and Bosnia-Herzegovina. Eventually, Krstic found himself conscripted into the Army of Republika Srpska. Krstic maintains that he spent the following three years performing "office work and other clerical tasks." The government asserts that Krstic's brigade "had been involved in the massacre of a large number of unarmed Muslim prisoners in 1995, in areas in close proximity to [Krstic]'s duty station."

In 1998, three years after leaving the military, Krstic and his family emigrated to the United States. As part of a refugee application, Krstic filled out an I-590 form,[1] which requires, among other things, applicants to disclose foreign military service. Krstic contends that "someone wrote 'not served' in English" on the form. The government also claims that Krstic denied having served in the military "during a sworn, personal interview administered in Belgrade." Krstic and his family

---

[1]The I-590 form was required by the then Immigration and Naturalization Service for admission to the United States as a refugee. It was styled: "Registration for Classification as a Refugee."

were nevertheless granted refugee status and admitted to the United States.

Krstic and his family moved to Portland, Oregon. One year later, in 1999, they applied to become lawful permanent residents. As part of the application, Krstic filled out an I-485 form,[2] which also asks applicants to report any prior foreign military service. Krstic again did not disclose his service in the Army of Republika Srpska. Nevertheless, Krstic was issued an alien registration receipt card (the so-called "green card").

In 2005, the International Criminal Tribunal for the former Yugoslavia reported Krstic's military service to American immigration authorities. Federal agents entered Krstic's home and interviewed him. Krstic admitted to serving in the military but denied committing any war crimes. On December 11, 2006, approximately seven years after Krstic completed his permanent resident application, agents seized Krstic's green card.[3]

### B

Two months later, a grand jury for the District of Oregon returned an indictment charging Krstic with violating the first paragraph of 18 U.S.C. § 1546(a). The superseding indictment, filed on October 16, 2007, alleged in relevant part that

> [Krstic] . . . did knowingly possess an alien registration receipt card . . . which [he] knew to have been procured by means of materially false claims and

---

[2]The I-485 form, styled "Application to Register as a Permanent Resident Or Adjust Status," is required as part of an application to become a lawful permanent resident of the United States.

[3]This statement of facts reflects what the parties have stated they intend to present at trial. We do not rely on these statements as evidence in this appeal, but provide this summary as context for the purely legal questions presented.

statements and otherwise fraudulently obtained, in that [Krstic] stated . . . that [he] had never served in the military, thereby failing to reveal that, in truth and in fact, [Krstic] was a member of the Zvornik Infantry Brigade . . . in violation of Title 18, United States Code, Section 1546(a).

The indictment did not allege that the alien registration receipt card itself was forged, counterfeited, altered, or falsely made. Rather, it simply charged Krstic with obtaining an alien registration card by means of a false statement.

Krstic moved to dismiss the indictment, contending that possessing an authentic immigration document procured by means of a false statement does not constitute an offense under § 1546(a). He argued that § 1546(a) criminalizes possession only of an already forged, counterfeited, altered, or falsely made immigration document. The district court agreed with Krstic and dismissed the indictment. The United States timely appealed.

## II

### A

We have a classic question of statutory interpretation to resolve. We begin, as we must, with the text of the statute. The first paragraph of § 1546(a) provides in relevant part:

*Whoever knowingly forges, counterfeits, alters, or falsely makes any immigrant or nonimmigrant* visa, permit, border crossing card, alien registration receipt card, or other document . . . or . . . *possesses . . . any such* visa, permit, border crossing card, alien registration receipt card, or other document . . . *knowing it to be forged, counterfeited, altered, or falsely made, or to have been procured by means of any false claim or statement* . . . [shall be punished].

§ 1546(a) (emphases added).

**[1]** At first glance, the statute appears to prohibit two independent acts. The first part criminalizes "knowingly forg[ing], counterfeit[ing], alter[ing], or falsely mak[ing]" an immigration document. The second part seems to punish "possess-[ing]" an immigration document "knowing it to be forged, counterfeited, altered, or falsely made, or to have been procured by means of any false claim or statement." The government urges us to interpret the statute in this bifurcated way.

**[2]** The words "any such," however, which appear between the paragraph's two halves, complicate our task. Krstic contends that "any such" refers back to the phrase "knowingly forges, counterfeits, alters, or falsely makes any immigrant or nonimmigrant visa." In Krstic's view, the statute contemplates an immigration document that has been forged, counterfeited, altered, or falsely made, not an authentic document. The government, on the other hand, maintains that "any such" is shorthand for the phrase "immigrant or nonimmigrant." According to the government, "[t]here is simply no reason why the verbs from the first clause should be converted into adjectives applicable to the second."

In our view, neither side has the better of this argument. The Second Edition of the Oxford American Dictionary defines "such," which is a demonstrative adjective in this context, as "of the type previously mentioned." *See Bahre v. Hogbloom*, 295 A.2d 547, 552 (Conn. 1972) ("The word 'such' ha[s] been construed as a related adjective referring back to and identifying something previously spoken of and that . . . naturally, by grammatical usage, refers to the last precedent."); Black's Law Dictionary 1473 (8th ed. 2004) ("[t]hat or those; having just been mentioned"). No bright-line rule governs this area of the English language. "Such" can refer exclusively to preceding nouns and adjectives. It can also refer to surrounding verbs, adverbial phrases, or other clauses. Context is typically determinative.

**[3]** Unfortunately, context does not help us here. Section 1546(a) "is certainly not a model of good draftsmanship; a better description would be that it is a masterpiece of obfuscation." *United States v. Tamayo*, 427 F.2d 1072, 1073 (9th Cir. 1970). Indeed, with this section, Congress has achieved in a single 124-word sentence a level of confusion it usually takes pages to create. In this statute, there are several candidates for the "last precedent." "Such" could refer solely to "immigrant or nonimmigrant" as the government urges, or it could refer also to "forges, counterfeits, alters, or falsely makes" as Krstic contends. The plain language of the statute compels neither the government's reading nor Krstic's reading. The statute's text leaves us in perfect equipoise.

B

Attempting to push us one way or the other, Krstic and the government collect a hodgepodge of additional arguments, none of which convinces us.

1

Krstic contends that dicta in *United States v. Campos-Serrano*, 404 U.S. 293 (1971), supports his interpretation. He emphasizes the following sentence from that opinion: "The statutory provision in question [§ 1546(a)] prohibits, *inter alia*, the counterfeiting or alteration of, or the possession, use, or receipt of an *already counterfeited or altered* immigrant or nonimmigrant visa, permit, or other document required for entry into the United States." *Id.* at 295 (emphasis added) (internal quotation marks omitted).

*Campos-Serrano* cannot support the weight Krstic places upon it. There, the Court resolved the question whether possession of an already counterfeited "alien registration receipt card" was "an act punishable under [an earlier version of] 18 U.S.C. § 1546." *Id.* The Court did not address whether § 1546(a) requires an already forged or counterfeited docu-

ment; rather, it concluded that an alien registration receipt card was not a "document required for entry into the United States" under the 1971 version of § 1546(a).[4] *Id.* at 301. The passage on which Krstic relies merely serves as general background information about the statute; it does not purport to be a comprehensive catalog of all conduct prohibited by the statute. The Court's usage of the phrase "*inter alia*" confirms this reading. *Id.* at 295.

2

Krstic also contends that the word "procured," as used in § 1546(a), refers to "a falsely made immigration document obtained through some *third party's* false claim or statement" (emphasis added). Krstic's position apparently is that one cannot "procure" something for oneself; rather, "procure" requires "an indirect object." In support of this contention, Krstic cites two dated state court cases for the proposition that "procure" requires "a second actor." *See State v. Desmarais*, 123 A. 582, 583 (N.H. 1924); *People v. Roderigas*, 49 Cal. 9, 11 (1874).

We are not persuaded. It is plainly possible to "procure" something for oneself. Dictionaries do not define "procure" to distinguish between things procured by third parties and things obtained by oneself. *See, e.g.*, Cambridge Dictionary of American English ("to obtain (something), esp. after an effort"). Furthermore, Krstic's state court cases do not stand for the proposition that only a third party may "procure" something. Indeed, the *Desmarais* court said precisely the opposite: "[To procure] means to obtain *for one's self* or for another." *Desmarais*, 123 A. at 583 (emphasis added). Krstic is correct that the *Roderigas* court "interpret[ed a] statute barring the procurement of a female to be 'with any man' as requiring one man as the procurer and another man as the

---

[4]Section 1546(a) was later amended to include alien registration receipt cards.

indirect object for whom the female is procured." The statute at issue in *Roderigas*, however, *required* such an interpretation of "procure." *See Roderigas*, 49 Cal. at 11 ("[The Act refers to one] 'who procures the gratification of the passion of lewdness *for another*' " (emphasis added)). In addition, the *Roderigas* court's holding was limited to the distinct context of prostitution, in which "procure" carries its own distinctive meaning. *See* Webster's Third New International Dictionary (1986), ("[T]o get possession of (women) and make available for promiscuous sexual intercourse (as in a house of prostitution).").**[5]**

3

The government proposes its own tiebreaker, arguing that "[i]f Congress intended the phrase 'any such visa' in the second clause to refer back to an already forged or counterfeited document, there would have been no reason to repeat the words 'forged, counterfeited, altered, or falsely made' in the second clause."

We disagree. Although the two phrases are worded identically, they refer to different actors. The first use of the phrase "forged, counterfeited, altered, or falsely made" refers to the *forger*; the second use of the same phrase refers to the *possessor* who *knows* of the forging. In other words, the first part of the paragraph prohibits knowingly *forging*, *counterfeiting*,

---

**[5]**Krstic also argues that the phrase "have been procured" is in the present perfect tense, meaning that Congress contemplated "an act that has been completed." This somehow means, according to Krstic, that "the 'have been procured by means of any false claim or statement' component in the second clause of paragraph one in § 1546(a) is most reasonably understood as referring to the past activity *of a third party* that resulted in a fraudulently produced immigration document that was found in the accused's possession" (emphasis added). We reject this contention. The tense of a verb does not usually, by itself, limit its subject. It is of course possible for the alien himself, rather than some third party, to "complete" an "act."

*altering*, or *falsely making* any immigration document; the second part of the paragraph proscribes knowingly *possessing* an immigration document that the *possessor* knows was forged, counterfeited, altered, or falsely made. Ambiguity remains.

### III

**[4]** Because we cannot decide this case on textual grounds alone, we turn to the history of the statute. Section 1546(a)'s first paragraph originated as section 22 of the Immigration Act of 1924. In original form, it read:

> Any person who knowingly (1) forges, counterfeits, alters, or falsely makes any immigration visa or permit, or (2) utters, uses, attempts to use, possesses, obtains, accepts, or receives any immigration visa or permit, knowing it to be forged, counterfeited, altered, or falsely made, or to have been procured by means of any false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained [shall be punished].

Immigration Act of 1924, ch. 190, § 22(a), 43 Stat. 153, 165.

**[5]** Here, thankfully, the inscrutable words "any such" are missing, and two numbered subsections, separated by the word "or," are present. *This* statute prohibited possessing an authentic immigration document knowing that it was procured by means of a false statement. Without the key words "any such," the statute's two numbered subsections, separated by the word "or," described independent ways by which one could break the law. One could violate the statute either by forging an immigration document *or* by possessing a document knowing that it has been procured by means of a false claim or statement.

**[6]** Based upon our review of later amendments to § 1546(a), we are convinced that Congress did not intend to narrow the law's scope to include only inauthentic documents. In 1952, Congress altered § 1546(a)'s first paragraph by expanding the list of immigration documents and by adding the words "any such" for the first time.**⁶** *See* Immigration and Nationality Act, Pub. L. No. 82-414, § 402(a), 66 Stat. 163, 275 (1952). Specifically, the 1952 amendments expanded the list of documents from any "immigration visa or permit" to any "immigrant or nonimmigrant visa, permit, or other document required for entry into the United States." *Id.* It also replaced the word "immigration" with "such." *Id.*

These changes plainly were designed to expand the statute's coverage to include "immigrant and nonimmigrant" visas, permits, and other immigration documents. Nothing in the amendments suggests that Congress intended to require, for the first time, an *already* forged or counterfeited document. The word "such" was probably added, in an unfortunate attempt to simplify the statute, to avoid repeating the newly added words "immigrant or nonimmigrant." A comparison of the 1952 statute with the 1948 version confirms this interpretation:

> Whoever knowingly forges, counterfeits, alters, or falsely makes any ~~immigration visa or permit~~immigrant or nonimmigrant visa, permit, or other document required for entry into the United States, or utters, uses, attempts to use, possesses, obtains, accepts, or receives any ~~immigration~~such visa ~~or~~, permit, or document, knowing it to be forged, counterfeited, altered, or falsely made, or to have been procured by means of any false claim or statement,

---

**⁶**Congress amended the statute once between 1924 and 1952. In 1948, Congress replaced the words "Any person who" with "Whoever knowingly" and removed the numbers. *See* Act of June 25, 1948, ch. 645, § 1546, 62 Stat. 683, 771.

or to have been otherwise procured by fraud or unlawfully obtained.[7]

Congress amended § 1546(a) again in 1986 to reverse the Supreme Court's decision in *Campos-Serrano*, which, as discussed above, held that an alien registration receipt card was not a "document required for entry into the United States." *See* Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 103(a), 100 Stat. 3359, 3380. The new version expanded the list of documents to include "border crossing card[s]" and "alien registration receipt card[s]." *Id.* It also replaced the phrase "required for entry into" with "prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in." *Id.* A comparison of the 1986 statute with the 1952 version confirms that Congress intended to expand the list of documents:

> Whoever knowingly forges, counterfeits, alters, or falsely makes any immigrant or nonimmigrant visa, permit, border crossing card, alien registration receipt card, or other document ~~required for entry into~~prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, or utters, uses, attempts to use, possesses, obtains, accepts, or receives any such visa, permit, ~~or~~border crossing card, alien registration receipt card, or other document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, knowing it to be forged, counterfeited, altered, or falsely made, or to have been procured by means of any false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained.[8]

---

[7]The strike-through text was present in the 1948 version of the statute but deleted in 1952. The underlined text was added in 1952.

[8]The strike-through text was present in the 1952 version of the statute but deleted between 1952 and 1986. The underlined text was added in 1986.

There is no indication that Congress intended § 1546(a)'s first paragraph to require an already forged, counterfeited, altered, or falsely made document.

**[7]** The statutory history satisfies us that § 1546(a)'s first paragraph does not require proof of an already forged, counterfeited, altered, or falsely made immigration document. The section prohibits possessing an otherwise authentic document that one knows has been procured by means of a false claim or statement.[9]

IV

Common sense confirms our interpretation. As the government correctly points out, reading § 1546(a)'s first paragraph as applying only to an already forged or counterfeited immigration document results in "leaving beyond the statute's scope the obvious harm of using or possessing an authentic document that one knows to have been procured by fraud or false statement to immigration authorities." To be sure, Krstic could have been charged under the *fourth* paragraph of § 1546(a), as well as 8 U.S.C. § 1306(c), two provisions that prohibit making false statements to immigration authorities. The first paragraph of § 1546(a), however, criminalizes acts that neither the fourth paragraph of § 1546(a) nor 8 U.S.C. § 1306(c) covers: *possession* of an immigration document that

---

[9]Krstic contends that because § 1546(a)'s statutory text is ambiguous, the rule of lenity, which "requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them," *United States v. Santos*, 128 S. Ct. 2020, 2025 (2008), compels us to construe the statute in Krstic's favor. We disagree. Resort to the rule of lenity is appropriate "only when a reasonable doubt persists about a statute's intended scope even *after* resort to the language and structure, legislative history, and motivating policies of the statute." *United States v. Banks*, 514 F.3d 959, 968 (9th Cir. 2008) (internal quotation marks omitted). Although we agree that the plain text of the statute is susceptible to two plausible readings, we are satisfied that statutory history resolves this case. The rule of lenity does not apply.

was fraudulently obtained. In view of the statutory history, we decline to adopt a reading that would effectively decriminalize such conduct.

V

A

**[8]** We lastly turn to Krstic's non-textual arguments. First, he claims that his prosecution is barred by the statute of limitations. Federal law establishes a default five-year statute of limitations for the prosecution of criminal offenses. *See* 18 U.S.C § 3282(a) ("Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed."). Krstic correctly points out that his alleged false claims or statements were made in 1998 and 1999 while the superseding indictment was not filed until 2007.

**[9]** The crime here, however, is a *possessory* offense, not a *false statement* offense. Unlike false statement crimes, possessory offenses have long been described as "continuing offenses" that are not complete upon receipt of the prohibited item. Rather, the statute of limitations does not begin to run until the possessor parts with the item. In *Eichelberger v. United States*, 252 F.2d 184 (9th Cir. 1958), for example, von Eichelberger was charged with "possession of firearms" in violation of federal law. *Id.* at 184-85. We "noted that the essence of the offense as charged in the . . . indictment . . . is *possession*. Therefore . . . the offense was a continuing one which began on the date the guns were received by von Eichelberger and continued to . . . the date set forth in the indictment. Present possession of a firearm is prohibited." *Id.* at 185. In recent times, we have reaffirmed *Eichelberger. See United States v. Walker*, 27 F.3d 417, 420 (9th Cir. 1994) ("Offense of illegal possession continues until date set forth

in indictment for statute of limitations purposes."); *United States v. Kayfez*, 957 F.2d 677, 678 (9th Cir. 1992) (per curiam) ("The 'instant offense' in this case is the possession of counterfeit notes . . . . Possession is a continuing offense.").

**[10]** Here, the statute and the indictment confirm that "the essence of the offense . . . is possession." *Eichelberger*, 252 F.2d at 185. Section 1546(a)'s first paragraph prohibits "*possess*[*ing*] . . . [an] alien registration receipt card . . . knowing it to be . . . procured by means of any false claim or statement." (emphasis added). The indictment specifically alleged that Krstic had committed a possessory offense: "Krstic, did knowingly *possess* an alien registration receipt card . . . which the defendant knew to have been procured by means of materially false claims and statements." The prohibited item here is the alien registration receipt card that was procured by means of a false claim or statement. Federal agents seized the card from Krstic on December 11, 2006, and filed the superseding indictment on October 16, 2007, well within the five-year window.

Trying to avoid this conclusion, Krstic points to the Supreme Court's decision in *Toussie v. United States*, 397 U.S. 112 (1970), which he claims "undermined" this court's decision in *Eichelberger*. In *Toussie*, the Court held that failing to register for the draft was not an offense that "continued to be committed each day that [the defendant] did not register." *Id.* at 114. Rather, the statute of limitations began running on the draft registration date prescribed by law. *See id.* at 117 ("[R]egistration was thought of as a single, instantaneous act to be performed at a given time."). Krstic emphasizes the following language in the Court's opinion:

> [T]he doctrine of continuing offenses should be applied in only limited circumstances . . . . These considerations do not mean that a particular offense should never be construed as a continuing one. They do, however, require that such a result should not be

reached unless the explicit language of the substantive criminal statute compels such a conclusion, or the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one.

*Id.* at 115. According to Krstic, "[n]either prong of this test is met" here.

We reject Krstic's contention. *Eichelberger* remains good law after *Toussie. Eichelberger* involved a *possession* offense; *Toussie* involved a failure to register for the draft. Furthermore, because Congress expressly defined the offense here as possessory, "the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one." *Id.*

B

Finally, Krstic earnestly contends that the constitutional avoidance canon counsels against adopting the government's interpretation of § 1546(a). Krstic bases this argument on several constitutional provisions and theories. First, he claims that, "[i]n the absence of an explicit statement by Congress that offenses involving purported misconduct in the obtaining of immigration documents are to be treated as continuing offenses, the Fifth and Sixth Amendment rights of individuals in the United States to the fair and timely trial of criminal offenses mandate that the limitations period established by § 3282(a) be respected." Second, Krstic contends that not following the § 3282(a) statute of limitations would violate the separation of powers because it would breach "the Constitution's limits to the criminal jurisdiction of the federal courts." Krstic cites no authority directly on point for either of these arguments.

[11] Krstic's constitutional claims border on the frivolous. The statute of limitations did not begin to run until govern-

ment agents confiscated Krstic's green card. We have encountered no authority, and Krstic cites none, suggesting that Congress's decision to characterize a crime as a possession offense as opposed to a false statement offense implicates constitutional considerations. Nor does the Sixth Amendment's Speedy Trial Clause apply here. *See United States v. Lovasco*, 431 U.S. 783, 788-89 (1977) ("[A]s far as the Speedy Trial Clause of the Sixth Amendment is concerned, [preindictment] delay is wholly irrelevant, since . . . only a formal indictment . . . engage[s] the particular protections of that provision." (internal quotation marks omitted)). Finally, Krstic's separation of powers argument is simply a revival of his statute of limitations claim, which we have already put to rest. )

## VI

Based upon the foregoing, we REVERSE the district court's dismissal of the indictment and REMAND for further proceedings.