PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 10-3529

UNITED STATES OF AMERICA

v.

GEOFFRY KOUEVI
a/k/a Kangni


GEOFFRY KOUEVI,
Appellant

Appeal from the United States District Court
for the District of New Jersey
(Crim. No. 2-07-cr-00785-004)
District Judge: Hon. Jose L. Linares

Argued: October 5, 2011

Before: McKEE, *Chief Judge*, FUENTES, *Circuit Judge*, and
GREENBERG, *Senior Circuit Judge*

(Opinion filed: October 24, 2012)

MICHAEL A. BALDASSARE, ESQ.  (Argued)
Baldassare & Mara, LLC
57 Broad Street, Suite 900
Newark, New Jersey  07102
*Attorney for Appellant*

PAUL J. FISHMAN, ESQ.
United States Attorney
CAROLINE SADLOWSKI, ESQ.  (Argued)
Deputy Chief, Appeals Division
970 Broad Street

1

Newark, New Jersey 07102
*Attorneys for Appellee*

OPINION

McKEE, *Chief Judge*.

Geoffry Kouevi  appeals his convictions for visa fraud and conspiracy to commit visa fraud.  His primary argument on appeal is that his conduct is not criminalized by the part of the statute he was indicted under. His appeal raises a question of statutory construction that is an issue of first impression in this Circuit.  For the reasons that follow, we will affirm the judgment of conviction.

## I.  FACTS AND PROCEDUDRAL HISTORY

Geoffry Kouevi, also known as "Kangni," was born and raised in Lome, Togo.  The Government  contends that from 2001 until 2005, Kouevi conspired with others to use fraudulent means to obtain "authentic" visas for at least 34 people through the American Embassy in Togo, and that those persons then used those visas to enter the United States. The scheme involved "diversity visas."

The United States makes diversity visas available to citizens of countries who send relatively low numbers of immigrants to the United States each year.  The visas are a means of promoting diversity within the annual pool of immigrants entering the United States.  *See Coraggioso v. Ashcroft*, 355 F.3d 730, 732 (3d Cir. 2004) (citing 8. U.S.C. § 1153(c)).   Individuals in Togo applied for diversity visas by entering the diversity visa lottery.  If they won that lottery, they became eligible to apply for permanent resident status in the United States, and if that status was granted, they were then permitted to immigrate with their spouse and children. The lottery winners were classified as DV-1 applicants; spouses were classified as DV-2 applicants; and their children were classified as  DV-3 applicants.

According to the evidence at Kouvei's trial,  Kouevi worked for the leader and organizer of the conspiracy, Akouavi Kpade Afolabi, otherwise known as "Sister," and with other co-conspirators, to obtain authentic visas through

2

fraudulent means by working with individuals in Togo who were actually eligible for diversity visas, but were unable to either complete the necessary paperwork, pay the required fees, or afford the airfare to the United States. According to the Government, Afolabi paid the required fees of persons who were eligible for the diversity lottery and assisted them in completing their paperwork. In exchange, Afolabi required the applicants to falsely represent that other unrelated individuals were their spouses and/or children, so that those individuals could also obtain visas to enter the United States under the program.

Kouevi played two roles in this conspiracy. He was responsible for coordinating the preparation of false documents used to support the fraudulent visa applications, and he tutored participants in the details of their false identities to prepare them for their interviews at the American Embassy in Togo. He also accompanied visa applicants to government offices in Togo and helped them acquire false passports, marriage certificates, and similar documents required to support their visa applications. This included obtaining additional false evidence of purported relationships including fake wedding rings and fake wedding pictures. He quizzed the applicants about the details of their identities and otherwise coached them in how to successfully interview at the American Embassy. He then took them to the American Embassy for their interviews. In return, Afolabi helped Kouevi fraudulently obtain his own visa and paid his costs for the visa and airfare to come to the United States.

Kouevi came to the attention of The Department of Homeland Security ("DHS") after Afolabi was arrested. DHS Investigators concluded that Afolabi had enticed girls as young as 13 from villages in West Africa with promises of education and employment in the United States. The Government contends that, using the visas she obtained with the assistance of Kouevi and others, Afolabi, brought the girls to the United States and forced them to work at hair braiding salons for up to 16 hours a day, 6 to 7 days a week, for several years, without any pay. These girls were forced into what can only be described as "slave labor;" they were also subjected to beatings, verbal and psychological abuse and rape.

3

On January 15, 2009, a federal grand jury sitting in Newark, New Jersey, returned a 23-count Superceding Indictment against Afolabi, Kouevi and two others. Kouevi was charged with one count of conspiracy to commit visa fraud, in violation of 18 U.S.C. § 371; and two counts of visa fraud, in violation of 18 U.S.C. § 1546(a) and § 2 (aiding and abetting).

On July 14, 2009, the district court severed Kouevi's case from his co-defendants, who were charged with more serious crimes, including forced labor.[1] A federal grand jury subsequently returned a two-count indictment charging Kouevi with conspiracy to commit visa fraud, in violation of 18 U.S.C. § 37, and visa fraud, in violation of 18 U.S.C. § 1546(a).

The Government called nine witnesses at the ensuing trial. They included Ouyi Nabassi, Bella Hounakey ("B.H."), Awa Fofana ("A.F."), Ahoeft Amah ("A.A."), and Vida Anagblah ("V.A."). These witnesses testified about their own visa applications and embassy interviews, and their interactions with and observations of Afolabi and Kouevi in connection with those applications and interviews, and the applications and interviews of others.

The jury convicted Kouevi on both counts and he was sentenced to 26 months imprisonment. This appeal followed.

## II. DISCUSSION[2]

---

[1] Because the DHS concluded that Kouevi did not know that his co-conspirators were engaged in forced labor, he was not charged with that offense.

[2] In his brief, Kouevi makes five arguments in support of his appeal. However, only one issue merits discussion, i.e., that his conviction for violating the first paragraph of 18 U.S.C. § 1546(a) should be reversed because that provision of the statute does not criminalize the use of authentic immigration documents that are procured by fraud. The other four arguments are as follows: (1) the conviction for violating § 1546(a) must be reversed because it was based on an unconstitutional constructive amendment of the indictment;

## A. THE CONVICTION FOR VIOLATING 18 U.S.C. § 1546(a).

Kouevi contends that his conviction for violating 18 U.S.C. § 1546(a) should be reversed because the paragraph of the statute he was convicted of violating does not criminalize activities involving authentic immigration documents. His argument attempts to distinguish between producing a counterfeit or fraudulent passport or visa and obtaining an authentic passport or visa by fraudulent means. He argues that Congress only intended to criminalize the former conduct and since the evidence here only proved the latter conduct, his actions are not criminal under § 1546(a).[3]

Kouevi was charged with violating 18 U.S.C. § 1546(a) by conspiring and aiding and abetting others:

> to utter, use, possess, obtain, accept and receive immigrant visas, namely diversity visas, for entry into and as evidence of authorized stay and employment in the United States, knowing that the diversity visas have been

---

(2) the district court erroneously permitted Officer Ayala to testify without any notice to the defense; (3) the conviction must be reversed based upon statements made during the Government's rebuttal; and (4) the sentence should be vacated and the matter remanded because the district court failed to make specific findings before imposing a six-level increase under U.S.S.G. § 2L2.1(b)(2)(B).

We have reviewed these four arguments and conclude that they do not merit further discussion. Indeed, Kouevi's constructive amendment claim is dependent on his claim that the first paragraph of 18 U.S.C. § 1546(a) does not apply to the use of authentic immigration documents procured by fraud.

[3] "We apply a plenary standard of review to issues of statutory interpretation." *United States v. Randolph*, 364 F.3d 118, 121 (3d Cir. 2004) (citation omitted).

procured by means of false claims and statements and otherwise procured by fraud and unlawfully obtained.

Kouevi and the Government agree that he was charged under the first paragraph of § 1546(a),[4] which provides:

> Whoever knowingly forges, counterfeits, alters or falsely makes any immigrant or nonimmigrant visa, . . . or other document prescribed by statute or regulation for entry into the United States, or utters, uses, attempts to use, possesses, obtains, accepts, or receives any such visa, . . . or other document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, knowing it to be . . . procured by means of any false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained [commits an offense under this section].

18 U.S.C. § 1546(a).

Kouevi contends that the first paragraph of § 1546(a), should not apply to his conduct because it only reaches forged visas. He argues that the text of the statute shows that Congress did not intend to criminalize possessing an authentic visa that was obtained by fraud, such as a visa obtained by lying on an application or during a visa interview - as happened here. According to Kouevi, the fourth paragraph of § 1546(a) prohibits that conduct, and he was not charged that portion of the statute. The fourth paragraph of §

---

[4] Section 1546 is captioned "Fraud and misuse of visas, permits, and other documents."

6

1546(a), states:

> Whoever knowingly makes under oath, or as permitted under penalty of perjury under section 1746 of title 28, United States Code, knowingly subscribes as true, any false statement with respect to a material fact in any application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, or knowingly presents any such application, affidavit, or other document which contains any false statement or which fails to contain any reasonable basis in law or fact [commits an offense under this section].

18 U.S.C. § 1546(a).

Kouevi argues that because he was charged with the first paragraph, and not the fourth paragraph, his conviction must be reversed.[5] In short, he asks us to reverse his conviction because the visas he helped procure were authentic, and not forged. Thus, he claims that the district court should have granted his motion for judgment of acquittal at the close of the Government's case. *See* Fed.R.Crim.P. 29.

First, Kouevi contends that in *United States v. Campos-Serrano*, 404 U.S. 293 (1971), the Supreme Court concluded that the first paragraph of § 1546(a) does not prohibit the possession or use of authentic immigration

---

[5] Kouevi's contention that the fourth paragraph of § 1546(a) criminalizes the possession of an authentic immigration document obtained by fraud is incorrect. The fourth paragraph criminalizes making a false statement when applying for an immigration document.

documents that were obtained by fraud.[6]  He relies on the following excerpt from the Court's opinion:

> The statutory provision in question prohibits, inter alia, the counterfeiting or alteration of, or the possession, use, or receipt of an already counterfeited or altered "immigrant or nonimmigrant visa, permit, or other document required for entry into the United States."

*Campos-Serrano*, 404 U.S. at 295.  According to Kouevi, it is clear from this statement that the Court concluded that the first paragraph of the statute prohibits only  the possession or use of a forged immigration document,  not the possession or use of an authentic immigration document that was obtained

---

[6] The first paragraph  of  § 1546(a) in effect in 1971 provided:

> Whoever . . . knowingly forges, counterfeits, alters, or falsely makes any immigrant or nonimmigrant visa, permit, or other document required for entry into the Unites States, or utters, uses, attempts to use, possesses, obtains, accepts, or receives any such visa, permit, or document, knowing it to be forged, counterfeited, altered, or falsely made, or to have been procured by means of any false statement, or to have been otherwise procured by fraud or unlawful conduct. . . .

*Campos-Serrano*, 404 U.S. at 295 n.1.

8

Much of his argument rests upon his interpretation of *Campos-Serrano*. We are not persuaded.

The issue in *Campos-Serrano* was whether the possession of a counterfeit alien registration card was punishable under the first paragraph of § 1546(a). The Court held that it was not because alien registration cards were not required for entry into the United States. *Campos-Serrano*, 404 U.S. at 296. The alien registration cards were issued after the alien had entered and took up residence in the United States, and played no part in the entry. The cards were merely intended to identify the bearer as a lawfully registered alien residing in the United States. They played no role in the alien's entry. *Id.*

In short, the issue before the Court was whether a particular forged document was proscribed by the statute, not whether the first paragraph of the statute criminalizes the possession of an authentic immigration document obtained by fraud. The language Kouevi relies upon is merely the Court's summation of a portion of the first paragraph of the statute; it is not an explanation of the statute's reach or scope. Indeed, it is apparent to us that by identifying the crimes, "inter alia," that § 1546(a) covers, the Court was not attempting to describe the entire reach of the first paragraph of § 1546(a).

The Court of Appeals for the Ninth Circuit agrees. The defendant in *United States v. Krstic*, 558 F.3d 1010 (9th Cir. 2009), also contended that the first paragraph of § 1546(a) does not criminalize the possession of authentic immigration documents obtained by fraud, and he relied upon the same language in *United States v. Campos-Serrano* that Kouevi relies upon. In rejecting that argument, the court explained:

> The passage on which Krstic relies merely serves as general background information about the statute; it does not purport to be a comprehensive catalog of all conduct prohibited by the statute. The Court's usage of the phrase "*inter alia*" confirms this reading.

9

558 F.3d at 1014.

Nonetheless, Kouevi contends that appellate courts have followed *Campos-Serrano*'s lead and have opined that the first paragraph of the statute was not intended to criminalize activities related to authentic immigration documents obtained by fraud, and that it cannot be read to reach that conduct. However, the cases Kouevi cites simply summarize a portion of the first paragraph of § 1546(a), while interpreting other language in the statue. The following examples illustrate this point.

In *United States v. Uvalle-Patricio*, 478 F.3d 699, 702 (5th Cir. 2007), the court of appeals wrote that "[t]he first paragraph of § 1546(a) criminalizes possession of forged immigration documents." (citation omitted). The defendant in *Uvalle-Patricio* was charged with possession of blank immigration permits, which is prohibited by the second paragraph of § 1546(a),[7] not the first paragraph. Thus, the court of appeals' statement simply summarizes a portion of the first paragraph of § 1546(a), not a description of all of the conduct prohibited by it.

In *United States v. Ryan-Webster*, 353 F.3d 353 (4th Cir. 2003), the court of appeals wrote:

> While the fourth paragraph of § 1546(a) deals with documents containing *false statements*, the first paragraph of § 1546(a) directly concerns documents containing, inter alia, *forgeries*.

*Id*. at 363 n.16 (emphasis in original). The defendant there forged the signatures of purported employers on certain documents in order to obtain legal permanent resident cards for her clients. The issue was whether those documents were prescribed by statute or regulation for entry into the United States or prescribed as evidence of an authorized stay or

---

[7] The second paragraph of § 1546(a) generally criminalizes the possession, by persons not authorized by the Attorney General or another proper official, of materials that can be used to produce false immigration documents.

employment in the United States. The issue was not whether the first paragraph criminalizes the possession of authentic immigration documents procured by fraud. Here, again, the court's statement was merely its summation of the first paragraph, and its use of "inter alia" once again makes that clear.

Finally, in *United States v. Osiemi*, 980 F.2d 344, 348 (5th Cir.1993), the court of appeals, commenting on the first paragraph of § 1546(a), wrote: "[S]trictly construed, taken literally, and given its plain and ordinary meaning, the language of § 1546(a), as amended, criminalizes the knowing possession of any counterfeited or altered document prescribed by statute or regulation for entry into the United States." The issue in *Osiemi* was whether a counterfeit foreign passport is a document "prescribed by statute or regulation" for entry into the United States within the meaning of § 1546(a). *Id*. at 346. The defendant contended that because the counterfeit foreign passport was not issued by the United States and/or because it did not contain a United States entry visa, no offense had been committed under § 1546(a). *Id*. at 345. The court of appeals held that a foreign passport was typically a document required for entry into the United States and, therefore, the possession of a counterfeit foreign passport was an offense under § 1546(a). The issue was not whether the defendant possessed an authentic immigration document obtained by fraud. Thus, the court's statement about § 1546(a) was limited to the facts before it and cannot be taken to describe all of the conduct proscribed by the first paragraph of § 1546(a).

The only court of appeals that has directly addressed Kouevi's contention has rejected it and has held that the possession of an authentic immigration document obtained by fraud is a crime under the first paragraph of § 1546(a). The defendant in *United States v. Krstic*, *supra*, was charged with knowingly possessing an alien registration card which he knew to have been procured by means of a materially false statement. *Krstic*, 558 F.3d at 1012. The indictment did not charge that the alien registration card was forged, counterfeited, altered or falsely made. *Id*. Rather, it simply charged Krstic with obtaining an alien registration card by means of a false statement. *Id*.

11

Krstic made the same argument that Kouevi now urges upon us about the limited reach of the first paragraph of 18 U.S.C. § 1546(a).[8]  The district court agreed with him and dismissed the indictment, *id*. at 1012-13, and the Government appealed.  The court of appeals began its analysis by noting that:

> At first glance, the statute appears to prohibit two independent acts. The first part criminalizes "knowingly forg[ing], counterfeit[ing], alter[ing], or falsely mak[ing]" an immigration document.  The second part seems to punish "possess[ing]" an immigration document "knowing it to be forged, counterfeited, altered, or falsely made, or to have been procured by means of any false claim or statement."

558 F.3d at 1013.  The Government wanted the court to interpret the statute in "this bifurcated way."  *Id*.

However, the court reasoned that "[t]he words 'any such'. . . which appear between the paragraph's two halves,

---

[8] As recited above, the first paragraph of § 1546(a) provides:
> Whoever knowingly forges, counterfeits, alters or falsely makes any immigrant or nonimmigrant visa, . . . or other document prescribed by statute or regulation for entry into the United States, or utters, uses, attempts to use, possesses, obtains, accepts, or receives any such visa, . . . or other document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, knowing it to be forged, counterfeited, altered, or falsely made, or to have been procured by means of any false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained [commits an offense under this section].

18 U.S.C. § 1546(a).

12

complicate our task." *Id*. It said:

> Krstic contends that "any such" refers back to the phrase "knowingly forges, counterfeits, alters, or falsely makes any immigrant or nonimmigrant visa." In Krstic's view, the statute contemplates an immigration document that has been forged, counterfeited, altered, or falsely made, not an authentic document. The Government, on the other hand, maintains that "any such" is shorthand for the phrase "immigrant or nonimmigrant." According to the Government, "[t]here is simply no reason why the verbs from the first clause should be converted into adjectives applicable to the second."

*Id*. The court was not persuaded by either reading. *Id.* ("neither side has the better of this argument.").

Rather, the court concluded that it could not resolve the question solely by parsing the statutory text. *Id*. at 1015.[9] Accordingly, it turned to the legislative history. The court held that the legislative history demonstrated to its satisfaction

> that § 1546(a)'s first paragraph does not require proof of an already forged, counterfeited, or falsely made immigration document. *The section prohibits possessing an otherwise authentic document that one knows has been procured by means of a false claim or statement*.

---

[9] The court of appeals in *Krstic* found that the plain language of the statute was ambiguous. 558 F.3d at 1015.

13

*Id*. at 1017 (emphasis added). The court explained:

> Common sense confirms our interpretation. As the Government correctly points out, reading § 1546(a)'s first paragraph as applying only to an already forged or counterfeited immigration document results in "leaving beyond the statute's scope the obvious harm of using or possessing an authentic document that one knows to have been procured by fraud or false statement to immigration authorities." To be sure, Krstic could have been charged under the *fourth* paragraph of § 1546(a), as well as under 8 U.S.C. § 1306(c), two provisions that prohibit making false statements to immigration authorities. The first paragraph of § 1546(a), however, criminalizes acts that neither the fourth paragraph of § 1546(a) nor 8 U.S.C. § 1306(c) covers: *possession* of an immigration document that was fraudulently obtained. In view of the statutory history, we decline to adopt a reading that would effectively decriminalize such conduct.

*Id*. (emphasis in original).

Legislative history is only an appropriate aid to statutory interpretation when the disputed statute is ambiguous. *See Bruesewitz v. Wyeth Inc.*, 561 F.3d 233, 244 (3d Cir. 2009), *aff'd Bruesewitz v. Wyeth LLC*, 131 S.Ct. 1068 (2011). However, a fundamental canon of statutory construction removes any ambiguity here, and provides a more direct path to the result reached in *Krstic*.

14

Reading the statute as Kouevi suggests we must would have the practical effect of reading some of the language out of the statute. The only way to give meaning to the whole paragraph is to read the term "any such" as referring to the list of immigration documents, but not to the ways in which the immigration documents were falsified.[10] Otherwise, the last clause ("or to have been procured by means of any false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained,") is transformed into surplusage; it would add absolutely nothing to what comes before it.[11] Such a reading would violate a fundamental canon of statutory construction. *See, e.g., Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("It is our duty to give effect, if possible, to every clause and word of a statute.") (citation and internal quotation marks omitted); *United States v. Nordic Village*, 503 U.S. 30, 36 (1992) (It is a settled rule "that a statute must, if possible, be construed in such fashion that every word has some operative effect.") (citation omitted); *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) ("We strive to avoid a result that would render statutory language superfluous, meaningless, or irrelevant.") (citation omitted).

Despite the fact that the plain language of the first paragraph of § 1546(a) prohibits the possession and use of authentic immigration documents obtained by fraud, Kouevi contends that Congress's actions since *Campos-Serrano* show that the first paragraph of § 1546(a) has always been limited to forged documents. He claims that since *Campos-Serrano*, Congress has amended § 1546(a) eight times, and notes that

---

[10] To arrive at the result that Kouevi wants, the term "any such" would have to be read to refer to the list of the ways in which the immigration documents were falsified, but not to the documents themselves. However, such a reading would make the final clause of the first paragraph surplusage and ineffective.

[11] As noted, *see* n.9, *supra*, the *Krstic* court found that the plain language of the statute was ambiguous, but, as the Government points out, it did not consider the surplusage created by the ambiguity it believed was present.

15

Congress has never amended the statute to alter *Campos-Serrano*'s conclusion that the first paragraph of § 1546(a) applies only to the possession or use of an already counterfeited or forged immigration document.[12]   However, this is not persuasive because, as we have explained, the Court in *Campos-Serrano* did not attempt to describe the entire reach of § 1546(a), nor did it purport to do so.

Moreover,   Kouvei's reading would mean that, in enacting this statute, Congress criminalized use of a forged or fraudulent visa, but did not intend to also criminalize obtaining an otherwise valid visa by means of forgery or fraud.   We think it extraordinarily unlikely that Congress intended that result.   *See, e.g., In re Kaiser Aluminum Corp.*, 456 F.3d 328, 338 (3d Cir. 2006) ("A basic tenet of statutory construction is that courts should interpret a law to avoid absurd or bizarre results.") (citation omitted).

Kouevi's second argument relies on the amendment history of § 1546(a) and other immigration statutes.   He claims that history demonstrates that Congress did not intend the terms "falsely makes" and "falsely made" in § 1546(a) to cover authentic diversity visas that were fraudulently obtained.   Kouevi notes that in 1996, Congress amended 8 U.S.C. § 1324c and added a definition of  "falsely make."   Section 1324c  of Title 8 is captioned: "Penalties for document fraud."   Section 1324c(f) was added in 1996.   That

---

[12] According to Kouevi, *Campos-Serrano* controls because Congress's failure to amend a statute after the Supreme Court interprets it (especially where Congress has otherwise amended the statute) is evidence that Congress agrees with the Court's interpretation.

In support of that statement Kouevi cites to *Safeco, Inc. v. Burr*, 551 U.S. 47, 58 (2007) (noting "the interpretative assumption that Congress knows how we construe statutes and expects us to run true to form"); *Comm'r of Internal Revenue v. Engle*, 464 U.S. 206, 225 (1984) ("We usually presume that Congress is . . . aware of [our longstanding] interpretation of a statute and [adopts] that interpretation when it re-enacts [the] statute without [explicit] change . . . .").

16

amendment defines "falsely make" as follows:

> For purposes of this section, the term "falsely make" means to prepare or provide an application or document, with knowledge or in reckless disregard of the fact that the application or document contains a false, fictitious, or fraudulent statement or material representation, or has no basis in law or fact, or otherwise fails to state a fact which is material to the purpose for which it was submitted.

8 U.S.C. § 1324c(f).

According to Kouevi, Congress added this definition at the request of the former Immigration and Naturalization Service ("INS") in response to decisions by the Executive Office for Immigration Review, Office of the Chief Administrative Hearing Officer ("OCAHO") which held that "falsely make" does not include providing false information on application forms. *See, e.g., United States v. Remileh*, 5 OCAHO 724, 1995 WL 139207, at *1 (O.C.A.H.O. Feb. 7, 1995) ("[T]he attestation of an employee to false information on a Form I-9[13] does not constitute the creation of a 'falsely made' document in violation of 8 U.S.C. § 1324(c)."). As Kouevi sees it, Congress's decision to amend 8 U.S.C. § 1324(c), by defining "falsely make" to include making false statements to obtain an immigration document, demonstrates that the question presented here, i.e., whether the first paragraph of 18 U.S.C. § 1546(a) applies to authentic immigration documents obtained by fraud, was "foremost in the mind of Congress in 1996, well after *Campos-Serrano*," yet the first paragraph of § 1546(a) was not amended. Again, we are not persuaded.

As we have explained, the statement from *Campos-Serrano* which Kouevi relies upon was not intended to define the parameters of the first paragraph of § 1546(a). Moreover,

---

[13] Form I-9 is an Employment Eligibility Form.

17

Kouvei's reliance on the language of the amendment creates a problem for him. It shows that when Congress was asked to clarify the meaning of "falsely make" in another context, it defined the term to include documents procured by fraud. However, we need not discuss this claim in detail because it is rooted in Kouvei's interpretation of *Campos-Serrano*, and we have already explained why that case simply does not support Kouevi's contention that the first paragraph of § 1546(a) does not criminalize the possession or use of an authentic immigration document obtained by fraud.

Moreover, our interpretation of the first paragraph of § 1546(a) is consistent with the Court's analysis in *United States v. Moskal*, 498 U.S. 103 (1990). There, while construing a different statute, the Court held that "falsely made" "encompasses genuine documents containing false information." *Id*. at 110. The statute at issue in *Moskal* was 18 U.S.C. § 2314, which prohibits the interstate or foreign transportation of "any falsely made, forged, altered, or counterfeited securities or tax stamps, knowing the same to have been falsely made, forged, altered, or counterfeited." Moskal was a participant in a title-washing scheme. *Id*. at 105. Other participants in the scheme bought used cars in Pennsylvania, rolled-back the odometers, and altered the titles to reflect the lower mileage. *Id*. The altered titles were then sent to other participants who submitted them to authorities in Virginia. *Id*. The Virginia authorities, who were unaware of the title alterations, issued Virginia titles containing the false mileage figures. *Id*. at 105-06. The washed titles were then sent back to Pennsylvania, where they were used to facilitate sales to unsuspecting buyers. *Id*. at 106. Moskal sent altered titles to Virginia and he received the washed titles back when they were returned to Pennsylvania. *Id*.

Moskal was convicted of violating 18 U.S.C. § 2314 by receiving two washed titles. On appeal, he made the same linguistic argument in challenging his conviction under 18 U.S.C. § 2314 that Kouvei makes here in challenging his conviction under 18 U.S.C. § 1546(a). Moskal claimed his conduct did not violate § 2314 because, although he was participating in a fraud (and thus had the requisite statutory intent), the washed titles were not themselves "falsely made." *Id*. at 107. He contended that since an authentic title had been

issued by appropriate state agencies that were unaware of any underlying fraud, the resulting title was genuine. Since the title that the state issued was valid, Moskal claimed they were not "falsely made" as required by the statute of conviction. *Id*.

The Court's explanation of why it disagreed with Moskal is fatal to Kouevi's argument here. In rejecting the argument, the Supreme Court explained:

> We think that the words of § 2314 are broad enough, on their face, to encompass washed titles containing fraudulently tendered odometer readings. Such titles are "falsely made" in the sense that they are made to contain false, or incorrect, information.

*Id*. at 108-09. The Court also rejected the claim that falsely made documents were synonymous with forged or counterfeited documents. It wrote:

> Short of construing "falsely made" in this way, we are at a loss to give *any* meaning to this phrase independent of the other terms in § 2314, such as "forged" or "counterfeited," By seeking to exclude from § 2314's scope any security that is "genuine" or valid, Moskal essentially equates "falsely made" with "forged" or "counterfeited." His construction therefore violates the established principle that a court should give effect, if possible, to every clause or word of a statute.

*Id*. at 109 (citation omitted) (emphasis in original).

Moskal had argued that at common-law "falsely made" had an established common-law meaning equivalent to forgery. 498 U.S. at 114. Therefore, "falsely made" excluded authentic or genuine documents that were merely

19

false in content. *Id*. Accordingly, Moskal contended that Congress should be presumed to have adopted this common-law definition in construing § 2314. "[W]here a federal criminal statute uses a common-law term of established meaning without otherwise defining it, the general practice is to give that term its common-law meaning." *Id*. (citation omitted). However, *Moskal* concluded that the meaning of "falsely made" was ambiguous at common law.

Despite the rather obvious fact that *Moskal*'s reasoning clearly applies here Kouevi cites *United States v. Merklinger*, 16 F.3d 670 (6th Cir. 1994), in arguing that courts should limit *Moskal* to statutes that require a departure from the common law meaning of "falsely made" in order to punish conduct that Congress intended to reach. *Id*. at 673-74 & n.4. This argument again focuses on the fact that the fourth paragraph of § 1546(a), prohibits the possession or use of an authentic immigration document obtained by fraud. According to Kouevi, it is therefore unnecessary to interpret the first paragraph of § 1546(a) to include authentic immigration documents obtained by fraud.

However, the argument ignores the fact that Kouevi's conduct is not punished by another provision of the statute. As noted, the fourth paragraph of § 1546(a) does not punish the possession or *use* of authentic immigration documents obtained by fraud. Rather, it prohibits *making* a false statement when applying for an immigration document.

Nevertheless, Kouevi claims "additional legal authority" demonstrates that the first paragraph of § 1546(a) does not apply to authentic immigration documents obtained by fraud. He relies on various rather tangential authorities such as the model jury instructions. He points out the instructions pertaining to the first paragraph of § 1546(a) tell jurors that the Government must prove that "the defendant uttered, used, attempted to use, possessed, obtained, accepted or received a <u>forged, counterfeited, altered or falsely made document</u>." Moore's Federal Model Jury Instructions, Chapter 47, Instruction 47-2 (underlining is Kouevi's).

He then quotes the following statement from *United States v. Polar*, 369 F.3d 1248 (11th Cir. 2004):

20

> The district court specifically instructed the jury as follows:
>
> The indictment charges the defendant with violation of Title 18 United States Code, Section 1546(a). That provision makes it a federal crime to *knowingly* possess a false or counterfeit Visa or other document required as evidence of an unauthorized stay or employment in the United States.

*Id*. at 1251 n.2 (emphasis in original).

Lastly, Kouevi notes that the United States Attorneys' Manual states "The first paragraph of 18 U.S.C. § 1546(a) proscribes the forging, counterfeiting, altering, or falsely making of certain immigration documents or their use, possession, or receipt."

www.usdoj.gov/usao/eouse/foia_reading_room/usam/title9/crm01524.htm. Kouevi submits that description from the Manual clearly means that the first paragraph of § 1546(a) prohibits the possession of "certain immigration documents" only if they were forged, counterfeited, altered, or falsely made. As he sees it, that description does not mean that the first paragraph of § 1546(a) prohibits the possession of authentic immigration documents that were obtained by fraud.

Kouevi's "additional legal authority" argument is meritless. As the Government notes, Model Jury Instruction 47-2 was drafted to cover one application of the first paragraph of § 1546(a), i.e., the use of forged documents. *Id*. ("The indictment charges the defendant with using (or attempting to use or uttering or possession or obtaining or accepting or receiving) a forged (or falsely made or counterfeit or altered) visa (or specify other document)." The Model Instruction cited by Kouevi does not address the portion of the first paragraph which he was charged with violating, viz., the possession of an authentic immigration that

21

was procured by fraud.

The jury instruction in *Polar* also provides no comfort to Kouevi. The defendant there had a passport which contained a counterfeit Alien Documentation Identification Telecommunication stamp mark ("ADIT") and he used the passport to obtain Social Security cards.[14] The issue before the court was whether the defendant's use of the passport containing a fraudulent ADIT stamp violated § 1546(a). The district court's instruction was thus fashioned to meet the evidence of offending conduct there. The instruction had nothing to do with whether the first paragraph of § 1546(a) applies to the possession or use of authentic immigration documents obtained by fraud.

Finally, we hardly need respond to Kouevi's attempt to elevate a statement from the United States Attorneys' Manual to the status of legal authority. The Manual is an internal agency practice guide and it is not a definitive statement of the law, as the Manual expressly indicates.[15] Kouevi's

---

[14] An ADIT stamp mark "is placed in an alien's passport at a port of entry or at an [INS] district office; . . . this stamp mark serves as temporary proof of lawful permanent residence in the United States; . . . and . . . serves as INS authorization for employment, such that a passport with an ADIT stamp mark can be used as identification to obtain a valid Social Security card." *Polar*, 368 F.3d at 1250 n.1.

[15] *See* United States Attorneys' Manual, Section 1-1.00, "Purpose." ("The United States Attorneys' Manual is designed as a quick and ready reference for United States Attorneys, Assistant United States Attorneys, and Department attorneys responsible for the prosecution of violations of federal law. It contains general policies and some procedures relevant to the work of the United States Attorneys' offices and to their relations with the legal divisions, investigative agencies, and other components within the Department of Justice. . . . The Manual provides only internal Department of Justice guidance. It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal. Nor are any limitations hereby placed on otherwise

argument invites us to cherry-pick the language of the Manual that affords arguable support for his position while ignoring other language that expressly negates using the Manual as legal authority. Moreover, the statement he relies upon is not intended to limit the application of the first paragraph of § 1546(a) to forged documents; it merely refers to one of the first paragraph's applications.

Lastly, Kouevi attempts to rely on the rule of lenity. We have explained the operation of that rule as follows:

> In interpreting an ambiguous criminal statute, the court should resolve the ambiguity in the defendant's favor. The rule of lenity applies in those situations in which a reasonable doubt persists about a statute's intended scope even after resort to the language and structure, legislative history, and motivating policies of the statute. The rule is not properly invoked simply because a statute requires consideration and interpretation to confirm its meaning. It applies only if there is such grievous ambiguity or uncertainty in a statute that, after seizing everything from which aid can be derived, the Court can make no more than a guess as to what Congress intended.

*United States v. Doe*, 564 F.3d 305, 315 (3d Cir. 2009) (citations, internal quotation marks and bracket omitted).

However, we do not think that the statute in question is sufficiently ambiguous to justify resort to the rule of lenity. "The simple existence of some statutory ambiguity, however, is not sufficient to warrant application of the rule of lenity, for most statutes are ambiguous to some degree." *Dean v. United States*, 556 U.S. 568, 577 (2009) (citation omitted).

lawful litigative prerogatives of the Department of Justice.").

Kouevi does not explain the purported "ambiguity" in the first paragraph of § 1546(a). He simply states that "history and structure allow for a reading that limits the scope of the first paragraph of § 1546(a) ¶ 1 to offenses involving only forged documents, and which excludes authentic documents procured by fraud." Therefore, he submits that "[i]n accordance with the rule of lenity, these alternate readings of § 1546(a) ¶ 1 mean that the conviction should be reversed." Kouevi's Br. at 23.

However, these are simply conclusory statements that do not demonstrate any ambiguity. More importantly, as we have explained, we cannot breathe sufficient ambiguity into the first paragraph to justify applying the rule of lenity without ignoring the canons of statutory construction we have discussed. The plain language of the statute reveals that the first paragraph of § 1546(a) must be read to prohibit the possession or use of authentic immigration documents which are obtained by fraud.

## III. CONCLUSION

For all of the above reasons, we will affirm the district court.

24